UNITED STATES, Appellee

v.

Jason R. JORDAN, Private
U.S. Marine Corps, Appellant

No. 01-0483

Crim. App. No. 99-1778

United States Court of Appeals for the Armed Forces

Argued February 27, 2002

Decided August 30, 2002

BAKER, J., delivered the opinion of the Court, in which GIERKE and EFFRON, JJ., joined. CRAWFORD, C.J., and SULLIVAN, S.J., each filed a dissenting opinion.

<u>Counsel</u>

For Appellant: Lieutenant Glenn Gerding, JAGC, USNR (argued and on brief).

For Appellee: Lieutenant Ross W. Weiland, JAGC, USNR (argued); Colonel Rose M. Favors, USMC, Commander Peter A. Dutton, JAGC, USN, and Major William J. Collins, Jr., USMC (on brief); Colonel Marc W. Fisher, USMC.

Military Judge: David S. Durbin

**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.**

Judge BAKER delivered the opinion of the Court.

On July 30, 1999, at Bremerton, Washington, appellant was tried by a special court-martial composed of a military judge alone. Consistent with his pleas, appellant was convicted of two specifications of willful disobedience of a superior commissioned officer, failure to obey a lawful order by wrongfully having an unregistered guest in the barracks, four specifications of breaking restriction, and unlawful entry, in violation of Articles 90, 92, and 134, Uniform Code of Military Justice, 10 USC §§ 890, 892, and 934, respectively. He was sentenced to a bad-conduct discharge, confinement for 45 days, and forfeiture of $600.00 pay per month for one month. On December 1, 1999, in accordance with a pretrial agreement, the convening authority approved the sentence but suspended all confinement in excess of 24 days for a period of 6 months from the date of trial. On February 27, 2001, the Navy-Marine Corps Court of Criminal Appeals affirmed the findings of guilty and the sentence in an unpublished opinion. United States v. Jordan, No. 99-1778 (N.M. Ct. Crim. App. 2001).

This Court granted review of the following issues:[1]

---

[1] We heard oral argument in this case at Mahan Hall, United States Naval Academy, Annapolis, Maryland, as part of the Court's "Project Outreach." See United States v. Allen, 34 MJ 228, 229 n.1 (1992).

I.   WHETHER THE LOWER COURT ERRED WHEN IT FOUND AS A MATTER OF LAW THAT A SAILBOAT AMOUNTS TO A "STRUCTURE USUALLY USED FOR HABITATION OR STORAGE" FOR PURPOSES OF CONVICTING APPELLANT OF THE OFFENSE OF UNLAWFUL ENTRY.

II.  WHETHER THE LOWER COURT ERRED WHEN IT FOUND THAT LEANING ON A SAILBOAT'S RAILING CONSTITUTES AN "ENTRY" FOR PURPOSES OF CONVICTING APPELLANT OF THE OFFENSE OF UNLAWFUL ENTRY.

We reverse, holding that appellant's guilty plea to unlawful entry was improvident.  Appellant's providence inquiry does not establish a basis for concluding that appellant's conduct was prejudicial to good order and discipline or was of a nature to bring discredit upon the armed forces.

Background

The granted issues relate to appellant's unlawful entry conviction under Specification 5 of Charge III.[2] The elements of this offense are:

(1)  That the accused entered the real property of another or certain personal property of another which amounts to a structure usually used for habitation or storage;

(2)  That such entry was unlawful; and

---

[2] This specification (violation of Article 134) reads:

In that Private Jason R. Jordan . . . did, at or near the Port of Silverdale, located at Silverdale, Washington, on or about 27 June 1999, unlawfully board the private boat of George and Toni Rowe, civilians.

> (3) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

Para. 111b, Part IV, Manual for Courts-Martial, United States (2000 ed).[3]

The military judge accepted appellant's guilty plea to this offense based on the providence inquiry set forth in the appendix to this opinion. There was no stipulation of fact associated with appellant's pretrial agreement or the plea inquiry.

Based on this providence inquiry, the Court of Criminal Appeals concluded that appellant agreed the boat could be used as a place of habitation. Unpub. op. at 2-3. It also concluded that as a matter of law, the sailboat was a structure used for habitation and storage within the meaning of the Manual for Courts-Martial. Id. at 3. Further, the court stated:

> Insofar as the "entry" element is concerned, the appellant admitted that he leaned his body on the railing of the sailboat so that his upper body extended forward past the gunwale and that his feet ended up in the air. By doing so, he was effectively on the sailboat and had accomplished a trespass without the permission of the occupant. The occupant subsequently told Lance Corporal Bain, the roving sentry at the

---

[3] All Manual provisions cited are identical to the ones in effect at the time of appellant's court-martial.

4

> scene, that the appellant was leaning on her boat and expressed a desire that he be removed.

Id. (footnote omitted).

Finally, with respect to the third element of the offense, the Court of Criminal Appeals concluded "[t]he appellant admitted that such conduct would tend to 'harm the reputation of the service or lower it in public esteem.' Accordingly, [it found] the appellant's guilty plea to be provident." Id.

Before this Court, appellant claims that a sailboat cannot be the object of an unlawful entry because it is more like a car or plane than a "structure usually used for habitation or storage" under Article 134. He further argues that leaning on the rail of the gunwale is not an "entry" and, even if it is, it is not a sufficient enough entry on which to base the Charge. These arguments necessarily focus on elements (1) and (2) of the offense, as do the granted issues. However, they also relate to appellant's more general claim that the military judge erred in accepting the plea to unlawful entry because the plea was unsupported by the facts.

The Government first argues that the military judge established the factual predicate for appellant's unlawful entry during the providence inquiry. Second, it claims

appellant has not met his burden of establishing a substantial basis in law and fact to question the plea, and his own words objectively support his plea.  Further, the Government contends, an inhabited boat is a "structure" under Article 134, since a "houseboat" is listed as an example of a "structure" under Article 130 (Housebreaking), UCMJ, 10 USC § 930.  See para. 56c(4), Part IV, Manual, supra.  Appellant physically entered the structure when his upper body crossed over the gunwales of the craft.  Finally, the Government asserts, appellant admitted that his conduct was prejudicial to good order and discipline.

## Discussion

Under Article 45, UCMJ, 10 USC § 845, if an accused makes an irregular pleading, sets up matter inconsistent with a guilty plea, or appears to enter a plea improvidently or through lack of understanding of its meaning or effect, the plea shall not be accepted by the court.  Rejection of a guilty plea on appellate review requires that the record of trial show a substantial basis in law and fact for questioning the guilty plea.  United States v. Prater, 32 MJ 433, 436 (CMA 1991).

To guard against improvident pleas under Article 45, RCM 910(e), Manual, supra, provides: "The military judge shall not accept a plea of guilty without making such

6

inquiry of the accused as shall satisfy the military judge that there is a factual basis for the plea." In order to establish an adequate factual predicate for a guilty plea, the military judge must elicit "factual circumstances as revealed by the accused himself [that] objectively support that plea[.]" United States v. Davenport, 9 MJ 364, 367 (CMA 1980). It is not enough to elicit legal conclusions. The military judge must elicit facts to support the plea of guilty. United State v. Outhier, 45 MJ 326, 331 (1996). The record of trial must reflect not only that the elements of each offense charged have been explained to the accused, but also "make clear the basis for a determination by the military trial judge. . . whether the acts or the omissions of the accused constitute the offense or offenses to which he is pleading guilty." United States v. Care, 18 USCMA 535, 541, 40 CMR 247, 253 (1969).

At the same time, this Court and the Courts of Criminal Appeals are cognizant that Prater provides for a substantial basis test for appellate review of the providence of guilty pleas. By its nature, a guilty plea case is less likely to have developed facts, particularly where there is no accompanying stipulation of fact. Those facts that are part of the military judge's providence inquiry are not subject to the test of adversarial process.

We are similarly mindful that a decision to plead guilty may include a conscious choice by an accused to limit the nature of the information that would otherwise be disclosed in an adversarial contest.  Thus, this Court has declined to adopt too literal an application of Article 45 and RCM 910(e).  When this Court has addressed a bare bones providence inquiry, we have not ended our analysis at the edge of the providence inquiry but, rather, looked to the entire record to determine whether the dictates of Article 45, RCM 910, and Care and its progeny have been met.

In United States v. Sweet, 42 MJ 183 (1995), the providence inquiry included little more than a recitation by the military judge of the elements of indecent acts and the Manual's explanation as to the meaning of "indecent," followed by the accused's "Yes, sir" admission of guilt.  However, during the providence inquiry in Sweet, the military judge cross-referenced a stipulation of fact offered by the accused.[4]  On review, this Court acknowledged "that a more detailed inquiry in many instances may be advisable or even necessary in order to resolve questions surrounding the providence of pleas."  Id. at 185.  We nonetheless took into consideration related factors,

---

[4] The military judge stated: "Ensign Sweet, Specification 1 and 2 allege that you committed certain acts.  The Stipulation details those acts." 42 MJ at 184.

8

including the existence of and reference to the stipulation, and the accused's status as a commissioned officer, in concluding that his "yes" and "no" answers to the military judge's inquiry responded to questions of fact and not just conclusions of law.  Id.

To affirm appellant's guilty plea in this case would require us to go further than Sweet and conclude that a providence inquiry that includes conclusions of law alone satisfies the requirements of Article 45 and RCM 910(e). It does not.

Regarding the third element of unlawful entry, the colloquy between appellant and the military judge set forth in the appendix of this opinion reveals that appellant simply responded "Yes, sir" to the several questions put to him as to whether his conduct was prejudicial to good order and discipline or service discrediting.  These questions were legal conclusions with which appellant was asked to agree without any admissions from him to support them.[5]  As such, they were "[m]ere conclusions of law recited by an accused [that] are insufficient to provide a factual basis for a guilty plea."  Outhier, 45 MJ at 331.  Indeed, on the question of service discrediting conduct, appellant's statements that the owner appeared neither upset nor

9

agitated and that she declined to press charges when invited to do so suggest that the service's reputation may not have been impugned at all.[6]

As a matter of law, we have no doubt that in a given factual scenario, boarding a sailboat without the permission of the owner could constitute the offense of unlawful entry under Article 134.  However, based on the totality of the circumstances here, as revealed by appellant, we are at a loss to find the basis for the military judge's conclusion that appellant's conduct was prejudicial to good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.  Appellant stated he was curious about the vessel because it looked like his grandmother's boat.  This caused him to lean on the boat to get a better view.  His body weight shifted from the dock to the rail of the boat. See pages 1, 3, 4, and 8 of the appendix to this opinion.

Furthermore, this is not a case where considerations beyond the record of trial such as those found in Sweet are applicable.  Appellant was not an officer; he was a Private (E-1) with twelve months of service.  He was not even sure

---

[5] See page 6 of the appendix to this opinion.
[6] To the extent there is any indication of the trial judge's logic, it may be found in his statement: "It [appellant's actions] certainly didn't do anything for this civilian lady out there on that boat[.]" See page 7 of the appendix.

10

what part of the vessel the military judge meant when he referred to the stern. Nor is there a stipulation of fact cross-referenced in the military judge's inquiry which could provide a factual basis for concluding that appellant's conduct was service discrediting. The plea inquiry must establish the factual predicate for the plea. This inquiry does not.[7] The factual circumstances as revealed by appellant do not objectively support the third element of unlawful entry. United States v. Faircloth, 45 MJ 172, 174 (1996). Therefore, a substantial basis in law and fact exists in the record to question his guilty plea to this offense. Prater, 32 MJ at 436.

### Decision

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed as to Specification 5 of Charge III and the sentence. The finding of guilty to Specification 5 of Charge III and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy for remand to the Court of Criminal Appeals, which may order a rehearing or dismiss

---

[7] In light of this conclusion, we need not and do not reach a conclusion regarding the specific granted issues.

11

the affected specification and reassess the sentence based on the remaining findings of guilty.

APPENDIX

MJ:   Okay, Specification 5 is along the following lines:

One, that on or about 27 June, 1999, you entered the private boat of another, to wit: George and Toni Rowe;

Two, that such entry was unlawful;

Third, that under the circumstances your conduct was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.  Now, I want you to tell me what you did on the 27th of June related to this Specification that makes you think you are guilty of this.

ACC: Down by the Port, we were walking, and I saw a boat that looked exactly like my grandmother's back home, and I walked over to look at it and I leaned onto the boat, when [sic] my feet off the ground leaning into the boat looking, and that's basically what happened, sir. I didn't board the boat. [Defense counsel conferred with the accused.]

MJ: Private Jordan, I think you were talking with your counsel, you might have something else to tell me?

ACC: Just that my entire body weight was on the boat, sir.

MJ: Your entire body weight was on the boat?

ACC: Yes, sir.

MJ: What kind of a boat was it?

ACC: It's a sailboat, sir.

MJ: Sailboat.  Are you familiar with sailboats?

ACC: Not really, sir.

MJ: What size was it?

ACC: Probably like 25 feet, sir.

MJ: 25 footer?

ACC: Something like that, I think so.

MJ: Was it the size that a person could live on?

ACC: Yes, sir.

MJ: Was there any evidence that, not immediately while you were there, but was there any evidence that people were using it as a place [of] habitation, a place to live, intermittently or at all?

ACC: Um, not--[defense counsel conferred with the accused] Yes sir, when I leaned onto the boat I noticed there was somebody in the cabin area, sir.

MJ: Oh, so there was someone in the boat at the time?

ACC: Yes, sir.

MJ: How many people?

ACC: Just one that I saw, sir.

MJ: Now, was this boat tied to some sort of a pier?

ACC: Yes, sir.

MJ: And, when you said you were leaning in, I mean, my vision of this is that there was probably an open area near the stern. Is that correct?

ACC: I'm not sure what a stern is.

MJ: The back end, the butt end.

ACC: Yes, sir.

MJ: And there was some sort of a cabin over the forward end?

ACC: It was kind of in the middle, sir.

MJ: Okay, that was the built up area?

ACC: Yes, sir.

2

MJ: And that's where you saw this person?

ACC:  There was a window that I saw her in.

MJ: I'm sorry, her?

ACC: It was a lady, sir. Yes, sir.

MJ: Now, as you were standing on the pier, tell me what you did when you were "looking into this boat"?

ACC: I leaned on it and I was just looking all around it.

MJ: Where were your feet?

ACC: My feet were in the air.

MJ: Your feet were in the air?

ACC: Yes, sir.

MJ: Maybe we should start at the beginning, I mean, as you are approaching this boat, you are walking along the pier, is that correct?

ACC: Yes, sir.

MJ: Wooden planks?

ACC: Yes, sir.

MJ: Feet are clop, clop, clopping along on the wood?

ACC: Yes, sir.

MJ: How did it come to pass that you ended up with your feet in the air?  I'm having trouble picturing this.

ACC: When I leaned on to the boat, I was leaning on----

MJ: Are you hanging on to some of the rigging?

ACC:  No, I leaned onto the boat, sir, and my feet came up while I was leaning on it.

3

MJ: Oh, okay.  So you were, pardon my naval ways, you were leaning over the gunnel? The side of the ship--the side of the boat?

ACC: Yes, sir.  Over the railing, sir.

MJ: The railing, okay. So you were sort of teeter tottering, if you will, on the edge of this craft.  Was it your waist that was physically in touch with the railing?

ACC: Yes, sir.

MJ: Did this person on the boat see you, if you know?

ACC: Yes, sir.

MJ: If you know, how did you come to be discovered in this particular operation?

ACC: When the female saw me, I guess.

MJ: And what happened then?

ACC: She--actually right as she had seen me, the other lance corporal had came [sic] by and said that I was----

MJ: Is this Ragan Louis?

ACC: No, that--this is Lance Corporal Bain.

MJ: Oh, he's the roving patrol?

ACC: Yes, sir, and he came by and right as he came by I noticed that there was a female on the boat, so I got off of it. He asked the female if everything is okay, and she had said that I was leaning on her boat and that she wishes that I would be taken off, and he says "okay ma'am.  Do you want to press charges?", and she said "no", and we just left, sir.

MJ: Would this lady have been Toni Rowe, to your knowledge?

ACC:  I really don't know her name, sir.

MJ: Do we know it now?

DC: Yes, sir.

ACC: Yes, sir.

MJ: So we know now, he didn't know it then, but we know it now?

ACC: Yes, sir.

MJ: I assume her husband or her significant other is this George Rowe?

ACC: Yes, sir.

MJ: And that they owned this boat?

ACC: Yes, sir.

MJ: Just a minute, gentlemen. [Military judge reviewed the R.C.M. Manual.] All right. If there is something you want to consult about, I didn't mean to interrupt.

DC: No, sir.

MJ: Now, when we talked about unlawful entry, I'm going to repeat these elements for you:

First of all, that on or about 27 June 1999, you entered the private boat of another, to wit: George and Toni Rowe;

Two, that such entry was unlawful; and

Three, under the circumstances your conduct was to the prejudice of good order and discipline in the armed forces, or as [sic] a nature to bring discredit upon the armed forces.

Now, first of all, with regard to entry of a private boat, you understand that entry must [be] effected before the offense is complete. Do you understand that?

ACC: Yes, sir.

5

MJ: Do you also understand that entry of any part of the body, even a finger, is sufficient. Do you understand that?

ACC: Yes, sir.

MJ: Under those circumstances, do you believe that you entered this private boat?

ACC: Yes, sir.

MJ: Do you believe and admit that here today?

ACC: Yes, sir.

MJ: Any question in your mind about that?

ACC: No, sir.

MJ: Now, do you understand that the term "unlawfully" means to enter without consent of a person authorized, or any person authorized to consent to the entry. Do you understand that?

ACC: I understand, yes, sir.

MJ: Did anyone authorize[d] to consent to your entry authorize you to do so?

ACC: No, sir.

MJ: You were just curious?

ACC: Yes, sir.

MJ: And you also admit that your behavior in that occasion, with respect to that boat, entry of that boat, that your conduct was to the prejudice of good order and discipline in the armed forces?

ACC: Yes, sir.

MJ: And that your conduct was conduct of a nature to bring discredit upon the armed forces?

ACC: Yes, sir.

6

MJ: And that that prejudice and good order was reasonably direct and an obvious entry to good order and discipline [sic]?

ACC: Yes, sir.

MJ: And finally, that your conduct was of the nature to harm the reputation of the service or lower it in public esteem, is that correct?

ACC: Yes, sir.

MJ:  It certainly didn't do anything for this civilian lady out there on that boat, did it. . . .

* * *

MJ: Lieutenant Larson, do you wish me to conduct any further inquiry?

TC: Just one question, sir.

MJ: Uh-huh.

TC: And this covers both Specifications 5 and 2; two questions I guess. Did Mrs. Rowe express to the accused any displeasure about him boarding her boat, or to the other members of the military; and did she express to the accused or to any other members of the military concern about, for Specification 2, that the accused was down at the pier and his actions with Miss Hill?

MJ: Okay, I think I see where you are going. Yes, Lieutenant?

DC: Sir, I will object to that, that would be evidence that might--that trial counsel might attempt to bring out on the aggravation phase. However, in terms of the evidence itself for the providence inquiry, sir, I believe that it's not related to that, sir.

MJ: Well, I'm going to say this, in terms of bringing the service reputation into disrepute, I'm going to ask the questions about what her reaction was to his appearance on the boat.

DC:  Yes, sir.

7

MJ: Private Jordan, can you describe what Mrs. Rowe's reaction was upon seeing you leaning over the edge of the boat the way you were?

ACC: She came out, she's like "hello, hello" like that, and I'm like "I'm sorry, ma'am" and I got off and then he came around the corner.

MJ: Did she seem to be upset?

ACC: No, sir.

MJ: Did she seem to be agitated?

ACC: No, sir.

United States v. Jordan, No. 01-0483/MC

CRAWFORD, Chief Judge (dissenting):

As noted by Senior Judge Sullivan, with whom I agree, the majority engages in a curious appellate practice by disposing of this case based on an issue that was not raised or briefed by either of the parties. Further, the majority's holding is a ground-breaking opinion in that it constitutes a radical departure from over three decades of guilty plea jurisprudence in the military justice system. Finally, the majority's view is inconsistent with our prior case law, RCM 910, Manual for Courts-Martial, United States (2000 ed.), and United States v. Vonn, 535 U.S. ___, ___, 122 S. Ct. 1043, 1052-53 (2002). For all of the above procedural and substantive reasons, I must respectfully dissent.

Procedurally, the majority has decided this case based upon an allegedly incomplete providence inquiry concerning whether appellant's conduct was prejudicial to good order and discipline or service discrediting, an issue that was not raised or briefed before either our Court or the court below. Essentially, the majority has specified and decided an issue without allowing the parties the opportunity to be heard on that issue. Following good appellate practice, we should return the case to the Judge Advocate General of the Navy. He can then decide whether to dismiss Specification 5 of Charge III and remand the case to the Court of Criminal Appeals for sentence reassessment, or to

United States v. Jordan, No. 01-0483/MC

return the case to the Court of Criminal Appeals for that court to determine whether there was an adequate providence inquiry concerning whether appellant's conduct was prejudicial to good order and discipline or service discrediting.  At a minimum, the majority should formally specify the issue, order briefs from the parties, and preserve the option for additional oral argument before the Court, as we recently ordered in United States v. Baker, 56 MJ 165 (2001).

As to the substance of the majority's opinion, they cite no case where this Court has required more than an admission from an accused that his or her conduct was prejudicial to good order and discipline or service discrediting.[1]  This is not a case in which appellant argues that his conduct was not prejudicial to good order and discipline or service discreting.  Indeed, it is just the opposite.  If appellant wanted to contest whether his conduct was prejudicial to good order and discipline or service discrediting, he had that opportunity by entering a plea of not guilty.

In guilty plea jurisprudence, our Court now stands alone, and out of step with our own as well as other federal court precedents.  For more than three decades, we have ordered

---

[1] See United v. Key, No. 01-0646, ___ MJ ___ n.* (2002)(Crawford, C.J., concurring in the result).

2

United States v. Jordan, No. 01-0483/MC

military judges to inquire into the factual basis of guilty pleas,[2] in order to achieve the objectives of McCarthy v. United States, 394 U.S. 459 (1969), and Boykin v. Alabama, 395 U.S. 238 (1969) -- to ensure that any guilty plea is both knowing and voluntary. See RCM 910, supra; Vonn, supra; United States v. Seybold, 979 F.2d 582, 586-89 (7th Cir. 1992). A mere reading of the elements of the offense, accompanied by a bare-bones response from an accused that he understands those elements, is not sufficient to establish a knowing, voluntary plea. See United States v. Terry, 21 USCMA 442, 45 CMR 216 (1972).

In determining the legitimacy of a guilty plea, we have required a discussion of the facts underlying the criminal accusation. We have never required military judges to perform an in-depth inquiry concerning the meaning of "service discrediting" or conduct "prejudicial to good order and discipline in the military." In fact, one could say the opposite is true. See United States v. Sweet, 42 MJ 183 (1995). Contrary to the majority's assertion, there was much more to this providence inquiry than the military judge expounding "legal conclusions with which appellant was asked to agree without any admissions from him to support them." ___ MJ at (9).

_____

[2] See United States v. Care, 18 USCMA 535, 40 CMR 247 (1969).

3

The impact of the majority's opinion is to place an unnecessary burden on the military justice system. In light of this Court's apparent rejection of three decades of its own precedents and other federal court decisions, future providence inquiries should now be accompanied by detailed stipulations of fact, or when such are not forthcoming, inquiries by military judges that chronicle on the record the manner in which an accused's conduct violates Articles 134 and satisfies the majority's new providence inquiry standard. Practitioners will certainly be justified in questioning the appropriateness and wisdom of the majority judicially mandating so significant a change to guilty plea jurisprudence.

Because there is no substantial basis in law and fact for questioning this knowing, voluntary guilty plea, see United States v. Prater, 32 MJ 433, 436 (CMA 1991), I respectfully dissent.

United States v. Jordan, No. 01-0483/MC

SULLIVAN, Senior Judge (dissenting):

The practice of this Court has been to uphold guilty pleas where an accused's providence inquiry "indicates not only that the accused himself believes he is guilty but also that the factual circumstances as revealed by the accused himself objectively support that plea . . . ." United States v. Davenport, 9 MJ 364, 367 (CMA 1980), cited in United States v. Boddie, 49 MJ 310, 312 (1998). The majority holds that the plea inquiry in this case does "not objectively" support a finding "that appellant's conduct was service discrediting". __ MJ at (11). I disagree.

In my view, the entire plea inquiry must be considered on this question. Appellant admitted that "at or near the Port of Silverdale, located at Silverdale, Washington, on or about 27 June 1999, [he] unlawfully board[ed] the private boat of George and Toni Rowe, civilians." __ MJ at (3n.2). He further admitted that his conduct was prejudicial to good order and discipline in the armed forces and was conduct of a nature to bring discredit upon the armed forces. (R.68)

These admissions, however, do not stand alone in the record of trial. As a factual basis for this guilty plea, appellant further admitted that he was on restriction on the day of the incident and he broke that restriction by going to the port of Silverdale. (R.42) Moreover, he stated that he was accompanied by another Marine and a 15-year-old daughter of a Chief Petty

Officer at the time of the offense.  (R.70) This young girl was the key figure in three of appellant's other charged offenses (two "no contact" orders violations and one barracks guest violation).  Finally, appellant stated that he was discovered in the act of unlawful entry by the civilian owner of the boat and that a roving Marine patrol officer had to eventually resolve this matter with the civilian boat owner.  (R.65)  Surely, a public disorder involving a Marine (who is unlawfully off base) and a civilian which necessitated action by military police to smooth civilian and military relations fits the requirement of military disorder or service discrediting conduct.  See William Winthrop, Military Law and Precedents 731 (1920 Reprint) (disorderly conduct in town).  The majority leaves these important facts out in making its analysis.  Facts ignored, however, do not disappear.  As Aldous Huxley has said, "Facts do not cease to exist because they are ignored."[*]

In addition, unlike the majority, I would answer the granted issues in this case.  The granted issues (whether the boat was a place of habitation and whether appellant entered the boat) were largely questions of fact that should have been raised at the trial level.  There, the Government could have put on evidence to resolve whether this sailboat was a place of habitation and whether appellant made an entry by leaning on the railing of the sailboat.  Accordingly, I would reject appellant's belated factual arguments concerning the validity of his guilty pleas.

---

[*] Proper Studies (1927).

2

United States v. Jordan, No. 01-0483/MC

See generally United States v. Harrison, 26 MJ 474, 476 (CMA 1998) (post-trial speculation on the validity of guilty pleas should not normally be countenanced).

The boat in question was twenty-five feet long, with a cabin which was capable of being lived in, and it was inhabited at the time of the entry. Moreover, in response to a question from the military judge as to whether there was "any evidence that people were using it [the sailboat] as a place [of] habitation," appellant answered in the affirmative after consulting with his lawyer. (R.63) No more was required for purposes of the military criminal offense of unlawful entry. See United States v. Gillin, 8 USCMA 669, 25 CMR 173 (1958). Accordingly, on this basis, I would affirm the conviction.

There is one final concern I have with the law that is being made in this case. Appellant pled guilty to unlawful entry of a sailboat. This conviction was affirmed on appeal by the Court of Criminal Appeals. Our Court granted two legal issues regarding whether the sailboat was a dwelling and whether leaning on a boat's railing was an entry for the purposes of the crime of unlawful entry. The majority dodges these issues, yet reverses this Article 134 conviction based on an issue not raised by appellant at the trial level nor at the Court of Criminal Appeals. This issue, moreover, was not raised nor briefed nor argued at our Court.

This surprise reversal by the majority in this case is based primarily on the three-two decision of this Court in United

States v. Outhier, 45 MJ 326, 331 (1996).  The portion of Outhier relied upon by the majority states: "Mere conclusions of law recited by an accused are insufficient to provide a factual basis for a guilty plea." Id.  This holding in turn is based on the two-one decision of this Court in United States v. Terry, 21 USCMA 442, 45 CMR 216 (1972).

If one looks at Terry, one can see that the Terry case is a far different case than the instant case.  In Terry, the judge merely read aloud each specification and the elements and the accused said he understood them, then the judge accepted the plea. Id.  A more "bare bones" plea could not be imagined.  In contrast, the transcript of the plea in the instant case was 67 pages in length, covering multiple charges, to include appellant's association with the 15-year old daughter of a Navy non-commissioned officer.  As I have pointed out above, there was a sufficient factual basis to find that the unlawful entry guilty plea was supported in the record with regard to the service discrediting element.