**UNITED STATES, Appellee,**

v.

**Specialist Shayla R. SCOTT, United States Army, Appellant.**

**ARMY 20030238.**

U.S. Army Court of Criminal Appeals.

9 Feb. 2004.

For Appellant: Colonel Robert D. Teetsel, JA; Lieutenant Colonel Mark Tellitocci, JA; Major Allyson G. Lambert, JA; Captain John N. Maher, JA (on brief).

For Appellee: Colonel Lauren B. Leeker, JA; Lieutenant Colonel Margaret B. Baines, JA (on brief).

Before HARVEY, Senior Judge, BARTO, and SCHENCK, Appellate Military Judges.

## OPINION OF THE COURT

SCHENCK, Judge:

A military judge sitting as a special court-martial (SPCM) convicted appellant, in accordance with her pleas, of absence without leave (AWOL), marijuana use, larceny, and forgery, in violation of Articles 86, 112a, 121, and 123, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 912a, 921, and 923 [hereinafter UCMJ]. The convening authority approved the adjudged sentence to a bad-conduct discharge (BCD), confinement for four months, a $5,000 fine, and reduction to Private E1. This case is before the court for review pursuant to Article 66, UCMJ, 10 U.S.C. § 866.

Appellate defense counsel assert the following: (1) the charge sheet does not contain language empowering the SPCM to adjudge a BCD, creating a substantial legal question regarding the SPCM's authority to impose a BCD; and (2) appellant's eighty-one day AWOL was terminated after twenty-six days when she returned to military control. The government counters: (1) the general court-martial convening authority (GCMCA) specif-ically authorized a BCD when he referred appellant's charges to a SPCM and thus there are no jurisdictional deficiencies; and (2) appellant's actions did not terminate her AWOL after twenty-six days because her comments during the providence inquiry indicate that she knew she needed "to do more" to terminate her absence.

We hold that an annotation on the charge sheet specifically empowering the SPCM to adjudge a BCD is not required when a case is referred to a SPCM. We will modify the AWOL specification to reflect appellant's statement during the providence inquiry that she returned to her unit twenty-six days after she went AWOL.

## SPECIAL COURT–MARTIAL REFERRAL

### Facts

On 4 February 2003, the GCMCA, Major General Thomas F. Metz, signed a memorandum stating that appellant's charges were referred to a SPCM empowered to adjudge a BCD. Section V of appellant's Charge Sheet (Dep't of Def., Form 458 (Aug.1984)) includes the statement, "Referred for trial to the special court-martial . . . ." However, it does not include the words, "empowered to adjudge a bad-conduct discharge."

At trial, the military judge advised appellant that the maximum permissible punishment included a BCD. The military judge asked appellant if she had any questions; she responded, "No." Trial defense counsel did not object to the referral level and did not object when the military judge announced that appellant's adjudged sentence included a BCD. After announcement of the sentence, the military judge discussed the sentence limitation in the pretrial agreement. The military judge then asked appellant if she understood that the convening authority could approve the adjudged sentence, and appellant responded, "Yes." Finally, appellant's post-trial and appellate rights form, signed and initialed by appellant and dated the same date as her offer to plead guilty, indicates prominently on the first page, "BCD–Special Court–Martial."

## Law and Discussion

An instruction is usually included in section V of the charge sheet for Army SPCMs empowered to adjudge a BCD, stating that "the court-martial is empowered to adjudge a bad-conduct discharge." [1] In this case, the GCMCA, following the staff judge advocate's (SJA) pretrial advice,[2] signed a separate document referring appellant's case to a SPCM empowered to adjudge a BCD.[3] The discussion to R.C.M. 601(e)(1) (2002 ed.)[4] states:

> The convening authority should acknowledge by an instruction that a bad-conduct discharge, confinement for more than six months, or forfeiture of pay for more than six months, may not be adjudged when the prerequisites under Article 19 will not be met. *See* R.C.M. 201(f)(2)(B)(ii). For example, this instruction may be given when a court reporter is not detailed.
>
> Any special instructions must be stated in the referral [e]ndorsement.

▮ Accordingly, inclusion of the words, "the court-martial is empowered to adjudge a bad-conduct discharge," in the convening authority's SPCM referral memorandum or on the charge sheet is surplusage. We hold that all Army SPCMs are empowered to adjudge a BCD unless the convening authori-

ty expressly states that a particular SPCM is not so empowered. The convening authority should expressly state such a limitation in the referral signed by the convening authority, in special instructions on the charge sheet, or in both. The government must also fully comply with the provisions of AR 27–10, para. 5–27 (requiring detailed military judge and defense counsel, verbatim record, and SJA's pretrial advice), before a convening authority may approve a BCD adjudged at a SPCM.

## PROVIDENCE INQUIRY

### Facts

Appellant was charged with, and pleaded guilty to, AWOL from 16 August 2002 until on or about 5 November 2002. During the providence inquiry, appellant stated that on a Sunday, on about 11 September 2002, she returned from Louisiana and signed in with the charge of quarters (CQ) at her unit at Fort Hood, Texas. That same day she went to her off-post apartment in Killeen, Texas. The following exchange then occurred between appellant and the military judge:

> ACC: I returned home to my apartment here in Killeen and called the CQ back to

1. We are unable to find a requirement for this practice in the UCMJ, *Manual for Courts–Martial, United States* [hereinafter *MCM*], case law, or Army regulations. We suspect the practice of adding the superfluous words, "empowered to adjudge a bad-conduct discharge," originated in the early 1970s. During fiscal years 1970 through 1974, the Army convened approximately 114,600 SPCMs. While we do not know how many of these SPCMs were empowered to adjudge a BCD, we do know that about 5,000 BCDs were approved during this five-year period. Based on this information, we conclude that the overwhelming majority of SPCMs were not empowered to adjudge BCDs. We further conclude that the practice of annotating the charge sheet with the words, "empowered to adjudge a bad-conduct discharge," reinforced and clarified what was contained in the pretrial advice and directed in the convening authority's referral. Current Army military justice practice is much different from that of the early 1970s. In the last five fiscal years, there were approximately 2,400 SPCMs empowered to adjudge a BCD and only 51 SPCMs without such discharge authority.

2. We note that pretrial advice is not required in cases referred to a SPCM not empowered to adjudge a BCD, or summary courts-martial. Rule for Courts–Martial [hereinafter R.C.M.]

406(a) discussion (not requiring pretrial advice). *But see* Army Reg. 27–10, Legal Services: Military Justice [hereinafter AR 27–10], para. 5–27 (6 Sept. 2002) (requiring pretrial advice).

3. Even if the "empowered to adjudge a bad-conduct discharge" language was required on the charge sheet, its absence under the facts of this case is an administrative, nonjurisdictional error. *See United States v. Richardson*, 5 M.J. 627, 629 (A.C.M.R.1978) ("[N]ot ... every violation of a statutory provision in connection with the formation and proceedings of a court-martial will be considered a jurisdictional defect.").

4. The 1984 *MCM* states that "[t]he convening authority may acknowledge by an instruction that no bad-conduct discharge may be adjudged when the prerequisites for a bad-conduct discharge under Article 19 will not be met." R.C.M. 601(e)(1) discussion. Paragraph 33j of the 1969 *MCM* (Rev. ed.), the predecessor of R.C.M. 601(e)(1), indicates that the charge sheet may include instructions, such as, "in a special court-martial, that the authorized maximum punishment does not include a bad-conduct discharge."

make sure it would be okay to return to work. That is when he told me that my— which was my platoon sergeant, which was the Staff Duty Officer he was on duty. He basically said, "Well, why did Scott return. She has already been dropped from the roll [DFR]." So that kind of discouraged me about returning. And I left again.

MJ: Okay. Even if somebody makes a comment—comment like that it doesn't mean that you are authorized to stay away. As a matter of fact the platoon sergeant was wrong. It doesn't matter if it is a DFR or not. They are still supposed to return to military control as soon as possible and sign back into the unit. Do you think that gave you permission to stay away then for another period of time?

ACC: No, it didn't, Your Honor.

MJ: You knew that you still should have come back right away that next Monday morning?

ACC: Yes.

MJ: When did you return again?

ACC: On [the] 5th of November which was on a Tuesday.

MJ: Now I see these matters in the stipulation. I am sure [your trial defense counsel] explained to you also that if a soldier return[s] to military control and it is only momentary then that doesn't terminate the AWOL and it sounds to me like your return was so brief that you never really did return to military control. It is a little different from what I thought it would be. So just by coming and signing in and leaving immediately, do you understand that you never terminated the AWOL on 10 or 11 September and that you were still AWOL until 5 November?

ACC: I understand completely, Your Honor.

Thereafter, both trial and defense counsel responded affirmatively when the military judge stated, "Counsel it appears to me that we don't even have a termination at all in this midpoint period."

Appellant said that she talked to her squad leader on the telephone twice a week, from the beginning of September until her return in November. Appellant spoke to the acting First Sergeant during this period, as well. Both told appellant to return to the unit. Appellant explained to the military judge that she did not return due to family issues and because she was ashamed about defrauding the government.

## Law

■ We review a military judge's acceptance of a guilty plea for an abuse of discretion. *United States v. Eberle,* 44 M.J. 374, 375 (C.A.A.F.1996). We will overturn a military judge's acceptance of a guilty plea only if the record of trial shows a *"substantial basis"* in law and fact for questioning the plea. *United States v. Jordan,* 57 M.J. 236, 238 (C.A.A.F.2002) (citing *United States v. Prater,* 32 M.J. 433, 436 (C.M.A.1991)).

■ A military judge may not accept a guilty plea without first determining that a factual basis exists for the plea. R.C.M. 910(e); *see* UCMJ art. 45, 10 U.S.C. § 845; *Jordan,* 57 M.J. at 238. The military judge must elicit from the accused "factual circumstances as revealed by the accused himself [that] objectively support that plea." *United States v. Davenport,* 9 M.J. 364, 367 (C.M.A. 1980). When an accused sets up a matter inconsistent with the plea at any time during the proceeding, the military judge either must resolve that inconsistency or reject the accused's plea. *United States v. Garcia,* 44 M.J. 496, 498 (C.A.A.F.1996) (citing UCMJ art. 45(a); R.C.M. 910(h)(2)); *see also Davenport,* 9 M.J. at 367. In *United States v. Perron,* 58 M.J. 78, 81–82 (C.A.A.F.2003), our superior court reaffirmed the military justice system's commitment to a careful, thorough providence inquiry, stating:

The military justice system imposes even stricter standards on military judges with regards to guilty pleas than those imposed on federal civilian judges. *See United States v. Outhier,* 45 M.J. 326, 331 (C.A.A.F.1996) (noting that Article 45(a), UCMJ, 10 U.S.C. § 845(a) (2002), requires military judges, unlike civilian judges, to resolve inconsistencies and defenses during the providence inquiry or "the guilty plea[ ] must be rejected"). In *United States v. Care,* [18 U.S.C.M.A. 535, 40 C.M.R. 247, 1969 WL 6059 (1969),] this Court imposed an affirmative duty on mili-

tary judges, during providence inquiries, to conduct a detailed inquiry into the offenses charged, the accused's understanding of the elements of each offense, the accused's conduct, and the accused's willingness to plead guilty. 18 U.S.C.M.A. at 541–42, 40 C.M.R. at 253–54.

## Discussion

■ Appellant's statement during the providence inquiry, that she signed in with the CQ on 11 September 2002 and intended to report for duty the next day, is inconsistent with her guilty plea to AWOL from 16 August 2002 until 5 November 2002. As our court recently held,

> If, during a plea inquiry, evidence is adduced indicating the accused's casual presence in the unit area during the AWOL period alleged on the charge sheet, then before accepting the plea the military judge should explain voluntary termination and ensure that no factual basis exists for it. In doing so, the military judge should focus on … presentment with intent to return, presentment to a military authority, identification and disclosure of status, and submission to actual or constructive control.

*United States v. Rogers,* 59 M.J. 584, 588 (Army Ct.Crim.App.2003) (footnote omitted).

Appellant's perfunctory agreement with the military judge's statement that appellant needed to do more to terminate her AWOL, without any elaborating and supporting admissions from appellant, does not satisfy the requirements of Article 45, UCMJ, R.C.M. 910(e), and *Care,* 18 U.S.C.M.A. 535, 40 C.M.R. 247, 1969 WL 6059. *See Jordan,* 57 M.J. at 238–39. As our superior court stated in *United States v. Reeder,* 22 U.S.C.M.A. 11, 13, 46 C.M.R. 11, 13, 1972 WL 14382 (1972), "At the least, the statement obligated the military judge to make further inquiry to determine the full extent of the inconsistency and, absent the accused's withdrawal of [her] avowals, to reject the plea."

The *Reeder* court found a twenty-nine month AWOL terminated after six days, based upon Private Reeder's disclosure to the military judge during the providence inquiry that he entered a military police station

and informed the authorities that he was AWOL. 22 U.S.C.M.A. at 12–13, 46 C.M.R. at 12–13. Private Reeder was told twice to wait for formal processing; approximately one and one-half hours later he departed the military police station. *Id.; see also United States v. Coleman,* 34 M.J. 1020, 1021–22 (A.C.M.R.1992) (in analyzing factual sufficiency, finding voluntary termination of Friday through Sunday AWOL where absentee remained in barracks on Saturday and Sunday, the CQ was the only soldier from the unit working during the weekend, and absentee reported for duty on Monday). *But see United States v. Pinero,* 58 M.J. 501, 503–04 (N.M.Ct.Crim.App.) (holding no voluntary termination of AWOL because five-hour return to military control was a *"de minimis* interruption" and appellant stated that "it was not his intention to voluntarily terminate his [unauthorized absence] and submit to military control"), *pet. granted,* 58 M.J. 291 (C.A.A.F.2003) (granting review on whether military judge committed plain error in accepting guilty plea to AWOL in excess of thirty days where absentee was subject to military control and custody during portion of charged period).

■ At a minimum, the military judge in appellant's case should have explained to appellant the three-part test for voluntary AWOL termination, using the *MCM,* 2002, Part IV, para. 10c(10)(a), as a guide. This provision requires: (1) presentation to any military authority; (2) notification of the soldier's AWOL status; and (3) submission or demonstration of a willingness to submit to military control. In the absence of a more searching inquiry by the military judge or an explanation of voluntary termination, we find that the record of trial raises a substantial, unresolved question of law and fact as to the providence of appellant's guilty plea to a single, continuous absence from 16 August 2002 until 5 November 2002, as alleged in Charge I and its Specification. *See Prater,* 32 M.J. at 436; *Rogers,* 59 M.J. at 588; *Reeder,* 22 U.S.C.M.A. at 13, 46 C.M.R. at 13.

Unlike the *Reeder* court, however, we are not limited to approving one shorter, single

period of AWOL.[5] The *MCM* now authorizes us to divide one longer period of absence in an AWOL specification into two or more separate, shorter AWOLs under that same single specification. *MCM*, 2002, Part IV, para. 10c(11).[6] Specifically, this provision of the *MCM* states:

> An accused may properly be found guilty of two or more separate unauthorized absences under one specification, provided that each absence is included within the period alleged in the specification and provided that the accused was not misled. If an accused is found guilty of two or more unauthorized absences under a single specification, the maximum authorized punishment shall not exceed that authorized if the accused had been found guilty as charged in the specification.

To resolve the issue raised by appellant, we will modify Charge I and its Specification to account for the termination date of 11 September 2002.[7] We will indicate a second absence in Charge I and its Specification, beginning the next day when appellant failed to report for duty and continuing until 5 November 2002, the end-date originally charged.

The court affirms only so much of the findings of guilty of Charge I and its Specification as finds that appellant did, on or about 16 August 2002, without authority, absent herself from her unit, to wit: 565th Quartermaster Company, 544th Maintenance Battalion, 64th Corps Support Group, located at Fort Hood, Texas, and did remain so absent until on or about 11 September 2002; and that appellant did, on or about 12 September 2002, without authority, absent herself from her unit, to wit: 565th Quartermaster Company, 544th Maintenance Battalion, 64th Corps Support Group, located at Fort Hood, Texas, and did remain so absent until on or about 5 November 2002, in violation of Article 86, UCMJ. The remaining findings of guilty are affirmed. Reassessing the sentence on the basis of the error noted, the entire record, and the principles in *United States v. Sales*, 22 M.J. 305 (C.M.A.1986), the court affirms the sentence.

Senior Judge HARVEY and Judge BARTO concur.

---

5. *Compare MCM*, 1969 (Rev. ed.), para. 165 (no provision for finding of more than one absence under one specification), *with MCM*, 1984, para. 10c(11) (same provision as *MCM*, 2002, permitting multiple AWOLs under single specification).

6. *See United States v. Francis*, 15 M.J. 424, 429–30 (C.M.A.1983) (*cited with approval in Pinero*, 58 M.J. at 505 (Bryant, J., concurring in part, dissenting in part)); *United States v. Bush*, 18 M.J. 685, 685 (N.M.C.M.R.1984) (prior to publication of *MCM*, 1984, affirming action of supervisory authority that divided one longer AWOL into four separate, shorter AWOL specifications).

7. In her R.C.M. 1105 clemency letter to the convening authority, appellant stated that her parents (with whom she was staying while AWOL in Louisiana) urged her to return to her unit. She subsequently called her squad leader and then returned to her unit the next day. Appellant concluded, "After I left the orderly room, I reported to Agent [B], Criminal Investigation Division [CID]." The CID report indicates appellant was not available for an interview until 5 November 2002 because she was AWOL. No other information in the allied papers mentions a meeting with a CID agent on or about 11 September 2002. In any event, our findings make it unnecessary for us to determine whether we may consider appellant's statement about meeting with Agent B in regard to the providence of her guilty plea. *See United States v. Johnson*, 1 M.J. 36, 39 (C.M.A.1975); *United States v. Turner*, 11 M.J. 784, 788 n. 3 (A.C.M.R.1981); *United States v. Stouffer*, 2 M.J. 528, 530 (A.C.M.R.1976); *United States v. McKee*, 42 C.M.R. 797, 1970 WL 7234 (A.C.M.R.1970).