UNITED STATES

v.

**Wesley B. NEGRON, Corporal (E–4), U.S. Marine Corps.**

**NMCM 200100844.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 12 July 2000.

Decided 30 June 2003.

CDR Michael J. Wentworth, JAGC, USNR, Appellate Defense Counsel.

LT Hardy Vieux, JAGC, USNR, Appellate Defense Counsel.

CDR Paul Jones, JAGC, USNR, Appellate Defense Counsel.

LT C.J. Gramiccioni, JAGC, USNR, Appellate Government Counsel.

VILLEMEZ, Judge, delivered an opinion, Parts I–VII and X of which are for the Court.[1] LEO, Chief Judge,[2] concurs in that opinion. BRYANT, Judge,[3] filed an opinion concurring in parts I VII and X, and dissenting as to parts VIII, IX, and the Appendix. FINNIE, Senior Judge, CARVER, Judge, and RITTER, Judge, join in that opinion. HARRIS, Judge, filed an opinion concurring in Parts I, II, VI IX and the Appendix, and dissenting as to Parts III V and X. OLIVER, Senior Judge,[4] joins in that opinion. PRICE, Senior Judge, filed an opinion concurring in Parts I, II, VII, and VIII, and dissenting as to Parts III VI, IX, X, and the Appendix.

Before the Court En Banc.

VILLEMEZ, Judge:

Pursuant to his pleas, Appellant was convicted by a military judge, sitting as a general court-martial, of wrongful appropriation, making and uttering a worthless check, and depositing obscene matter in the mail, in violation of Articles 121 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 921 and 934. The sentence awarded was confinement for 18 months, reduction to pay grade E–1, forfeiture of all pay and allowances, and a bad-conduct discharge. The convening authority approved the sentence, but suspended confinement in excess of 12 months in accordance with a pretrial agreement.

On 12 March 2002, this Court issued its original decision in this case, setting aside the conviction of depositing obscene matter in the mail. *United States v. Negron*, No. 200100844, 2002 WL 436776 (N.M.Ct.Crim. App. 14 Mar. 2002)(unpublished op.). Having done so, the sentence was reassessed and modified. On 12 April 2002, the Government filed a Suggestion for En Banc Reconsideration of this Court's decision. Appellant did not file a reply to Appellee's Suggestion for

En Banc Reconsideration, which this Court granted on 24 April 2002.

We have carefully considered the record of trial, Appellant's original brief, with its two assignments of error; Appellant's affidavit of 27 August 2001; the Government's original response; the Government's brief on en banc reconsideration; and Appellant's answer on reconsideration, with his additional contentions. Vacating the original decision of this Court, we now conclude that the findings and the sentence, as approved on review below, are correct in law and fact and that no error materially prejudicial to the substantial rights of Appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

## I. Assignments of Error

In his original appellate brief of 18 September 2001, Appellant submitted two assignments of error: (1) the military judge erred in accepting his plea of guilty to depositing obscene matters in the mail, "where the record discloses that the letter so deposited was not calculated to corrupt morals or excite libidinous thoughts;" and (2) the sentence he received is inappropriately severe. Appellant's Brief of 18 Sep 2001 at 4. In his Answer on Reconsideration of 16 July 2002, Appellant additionally contends:

The Military Judge Did Not Include The First Sentence Of The Explanation In Part IV, ¶ 89c Of The Manual In The Definition Of Indecent Language He Provided To The Appellant During The Providence Inquiry And, Therefore, The Appellant's Guilty Plea May Not Be Affirmed On The Basis Of That Sentence;

The Test Set Forth In *United States v. French* [31 M.J. 57 (C.M.A.1990),] Is The Exclusive Military Test For Determining Whether Language Is Indecent Or Obscene; and

The Record Is Insufficient To Sustain A Conviction To The Lesser Included

---

1. Senior Judge Dorman and Judge Redcliff did not participate in the decision of this case.

2. Chief Judge Leo participated in the decision of this case prior to detaching on 6 May 2003.

3. Judge Bryant participated in this decision prior to detaching on 16 May 2003.

4. Senior Judge Oliver became the Court's Chief Judge on 6 May 2003.

Offense Of Disorderly Conduct.[5]

*Id.* at 7, 9, 23.

## II. FACTS

During the inquiry into the providence of his guilty pleas, Appellant explained that he worked at the base U.S. Post Office at Torii Station in Okinawa, Japan. As a postal clerk, he was responsible for currency kept in a safe in the post office. On several occasions, Appellant unlawfully took cash from the safe and spent it off base for his personal benefit. The total amount of Government funds taken was $1,540.00. Apparently, intending to return the money at some point, Appellant told the military judge: "I just intended to keep it for a while, sir, temporarily deprive the government of it." Record at 22.

Later, Appellant wrote a check for $500.00 cash on his account at Marine Federal Credit Union. Soon thereafter, he withdrew sufficient funds from that account, such that he knew the check would "bounce" when presented for payment. In an attempt to obtain funds to repay the Government and the credit union, Appellant applied for a loan from the same credit union. When his loan application was rejected, Appellant wrote a letter to the credit union and placed it in the United States mail system.[6] The letter contained the following language:

> Oh, yeah, by the way y'all can kiss my ass too!! Worthless bastards! I hope y'all rot in hell you scumbags. Maybe when I get back to the states, I'll walk in your bank and apply for a blowjob, a nice dick sucking, I bet y'all are good at that, right?

Charge Sheet; Record at 33–34.

## III. Introduction

As will be discussed and developed below, Appellant's letter to the unsuspecting personnel at the North Carolina credit union— measured by the standards of military law— is obscene. His explicit and descriptive words unmistakably invoke the image of the sexual act itself. Not only did Appellant

include a coarse vulgarity to identify this sexual act, but in order to make the picture he intended to paint perfectly clear, he also included a vulgarism to provide a very graphic description of the act itself. In the providence inquiry, Appellant admitted that he "intended to offend them," by conveying the message that the credit union personnel could commit sodomy on him. Appellant also indicates that he selected the words he used in the letter to provide the maximum possible shock value. We agree. If he had instead sent a picture, rather than the words he wrote, depicting the actions he so graphically described in his letter, *obscenity* would not be at issue in this case. It would be a "given."

## IV. Plea Providence—Depositing Obscene Matters in the Mail

### A. Government's and Appellant's Arguments

#### (1) Government's Position

In its Brief on En Banc Reconsideration of 9 May 2002, the Government contends that this Court's original decision of 12 March 2002 was flawed, in that the majority "erred by interpreting our superior court's holdings in *French* and [*United States v.*] *Brinson*[, 49 M.J. 360 (1998),] to be the *only* legal definition of indecent language." *Id.* at 3. The Government argues that "[o]ur superior court's holdings in both *French* and *Brinson* do not limit the legal definition of indecent language, but merely interpret it in light of a particular set of circumstances." *Id.* at 4. The Government contends:

> The term "obscene" is synonymous with the term "indecent," as defined in the offense of indecent language under Article 134, UCMJ. Manual for Courts-Martial, United States (1998 ed.), Part IV, ¶ 94c. The Manual defines indecent language as follows:
>
> > "Indecent" language is that which is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgust-

---

5. Due to the conclusions reached herein, we need not consider this third argument.

6. Neither the actual letter nor a copy of it was attached to the record as an exhibit. Being able to consider the actual letter would have been beneficial for this review.

ing nature, or its tendency to incite lustful thought. Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts. The language must violate community standards.

MCM, Part IV, ¶ 89c.

*Id.* at 2–3.

### (2) Appellant's Assertions

Appellant contends that his guilty plea to depositing obscene matters in the mail was not provident for two reasons. The first being that this Court is confined to the offense-element definition given by the military judge during the providence inquiry, and the second being that the military judge only elicited legal conclusions from Appellant, and "[m]ere conclusions of law recited by the accused are insufficient to provide a factual basis for a guilty plea." Appellant's Answer on Reconsideration of 16 Jul 2002 at 3–4, 8; Appellant's Brief of 18 Sep 2001 at 4–5.

Concerning the first point, Appellant argues:

> The definition of indecent language given to the Appellant by the military judge during providency did not include the "grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar filthy, or disgusting nature" language in the first sentence of ¶ 89c of the Manual. Therefore, the Government is incorrect when it asserts that this Court erroneously disregarded that part of the Manual's explanation. This Court may not affirm the Appellant's guilty pleas on the basis of a definition of an element that is different from the one given to him during the providency inquiry, and for which a factual basis to accept the plea was not established.

Appellant's Answer on Reconsideration of 16 Jul 2002 at 3–4.

Addressing the second point, Appellant contends that during the providence inquiry he provided simple "yes" or "no" responses to the military judge's questions of law, contrary to our superior Court's guidance that mere conclusions of law recited by an accused are insufficient to provide a factual basis for a guilty plea. Appellant's Brief of 18 Sep 2001 at 4–5; Appellant's Answer on Reconsideration of 16 Jul 2002 at 5–6.[7]

The linchpin of Appellant's argument, however, is that even if the military judge's providence inquiry was procedurally acceptable, the language in the questioned letter to the credit union is not "obscene" as a matter of military law. Primarily citing our superior Court's decisions in *French* and *Brinson,* Appellant submits that the military test to determine if language is criminally indecent solely lies in "'whether the particular language is calculated to corrupt morals or excite libidinous thoughts.'"[8] *French,* 31 M.J. at 60 (quoting *United States v. Linyear,* 3 M.J. 1027, 1030 (N.C.M.R.1977)). Appellant's Brief of 18 Sep 2001 at 6; *see also* Appellant's Answer on Reconsideration of 16 Jul 2002 at 9–11. Appellant believes the military judge also failed to establish a factual basis for concluding the language used in the letter violated the military community's standards of decency and obscenity and went beyond the customary limits of expression in the military community. Appellant's Brief of 18 Sep 2001 at 8–9 (citing *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *United States v. Hullett,* 40 M.J. 189 (C.M.A.1994); and *United States v. Holt,* 12 C.M.A. 471, 31 C.M.R. 57, 1961 WL 4522 (1961)); Appellant's Answer on Reconsideration at 9–18.

### B. Analysis

Looking at the issue of the adequacy of the providence inquiry process first, the guilty-plea nature of this case frames our analysis. Prior to accepting a guilty plea, a military judge must make an inquiry of an accused to ensure a factual basis exists for the plea. RULE FOR COURTS-MARTIAL 910(e), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.); *see Care,* 18 C.M.A. at 541, 40 C.M.R.

---

7. Appellant cites, among other cases, *United States v. Care,* 18 C.M.A. 535, 40 C.M.R. 247, 1969 WL 6059 (1969); *United States v. Faircloth,* 45 M.J. 172 (C.A.A.F.1996); and *United States v. Outhier,* 45 M.J. 326, 331 (C.A.A.F.1996).

8. "Libidinous" is defined as: "Having or marked by lustful desires: characterized by lewdness." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1304 (16th ed.1971).

at 253; *see also* Art. 45(a), UCMJ, 10 U.S.C. § 845(a). This inquiry must elicit sufficient facts to satisfy every element of the offense in question. R.C.M. 910(e), Discussion. This Court reviews a military judge's decision to accept an accused's guilty plea for abuse of discretion. *United States v. Eberle,* 44 M.J. 374, 375 (C.A.A.F.1996); *United States v. Gallegos,* 41 M.J. 446, 446 (C.A.A.F. 1995). A finding of guilty should not be set aside on appeal, unless there is a "substantial basis in law and fact for questioning the guilty plea." *United States v. Prater,* 32 M.J. 433, 436 (C.M.A.1991)(internal quotes omitted). Additionally, an unconditional guilty plea waives any objection "to the factual issue of guilt of the offense(s) to which the plea was made." R.C.M. 910(j).

▮▮▮ We do not review the adequacy of a guilty plea by speculating on the existence of facts that might invalidate it, particularly when such speculation contradicts the admissions of the accused. *United States v. Johnson,* 42 M.J. 443, 445 (C.A.A.F.1995). In consideration of a guilty plea, the evidence should be considered in the light most favorable to the Government. *United States v. Hubbard,* 28 M.J. 203, 209 (C.M.A.1989)(Cox, J., concurring).

In a review of the adequacy of a guilty plea, our superior Court in *United States v. Jordan,* 57 M.J. 236, 238–39 (C.A.A.F.2002) concluded:

> By its nature, a guilty plea case is less likely to have developed facts, particularly where there is no accompanying stipulation of fact. Those facts that are part of the military judge's providence inquiry are not subject to the test of adversarial process. We are similarly mindful that a decision to plead guilty may include a conscious choice by an accused to limit the nature of the information that would otherwise be disclosed in an adversarial contest. Thus, this Court has declined to adopt too literal an application of Article 45 and RCM 910(e).

In our review, this Court must be concerned with the adequacy of the factual basis upon which the military judge predicated his findings of guilty. "Mere conclusions of law recited by an accused are insufficient to pro-

vide a factual basis for a guilty plea." *Outhier,* 45 M.J. at 331. In *Jordan,* our superior Court set aside a decision of this Court on the basis that the military judge had not adequately developed a factual basis for one of the elements of a charged offense. Citing *Outhier* for the proposition that "[i]t is not enough to elicit legal conclusions," the Court in *Jordan* found that during the providence inquiry, the military judge merely posed a series of conclusory questions to which the accused simply responded, "Yes, sir." *Jordan,* 57 M.J. at 238.

In *Jordan,* the Court advised reviewing courts that the entire record should be considered in determining whether a providence inquiry is legally-sufficient, stating:

> When this Court has addressed a bare bones providence inquiry, we have not ended our analysis at the end of the providence inquiry but, rather, looked to the entire record to determine whether the dictates of Article 45, RCM 910, and *Care* and its progeny have been met.

*Id.* at 239. In an earlier opinion, the Court, then the United States Court of Military Appeals, indicated:

> The combination of all the circumstances obtaining here causes us to conclude that the appellant's plea was informed and voluntary within the meaning of ... *Care.* We believe no useful purpose would be served by reversing[,] because the judge's phraseology did not exactly duplicate that of the *Care* opinion.

*United States v. Burton,* 21 C.M.A. 112, 115, 44 C.M.R. 166, 169, 1971 WL 12477 (1971).

We find that the providence inquiry in this case was not "a bare bones" inquiry such as that described in *Jordan.* Rather—as revealed by a review of the entire record, as urged by both *Jordan* and *Burton*—it is a thorough and complete inquiry. After reviewing the record, this Court concludes that the military judge conducted a proper providence inquiry. While it may be desirable to have more of a dialogue between a military judge and an accused than that which took place in this case, there is no one format that must be followed. The inquiry is not a scripted one-act play with assigned speaking

parts, and the eloquence element of the elocution is not legally determinative. "Many accused lack the ability to articulate their responses fully, notwithstanding substantial pretrial preparation by their defense counsel." FRANCIS A. GILLIGAN AND FREDRIC I. LEDERER, COURT-MARTIAL PROCEDURE, VOL. 2, 212 (2nd ed.1991).

■ As promulgated by *Care* and its progeny, the purpose of a providence inquiry—through a discussion between the military judge and an accused into the facts and circumstances surrounding the act or acts charged—is to establish a factual basis that enables the military judge to conclude that the accused, in fact, is guilty. *United States v. Davenport*, 9 M.J. 364, 366 (C.M.A.1980). In doing so, "[m]ilitary judges may employ different techniques in complying with the ... *Care* requirement ... that the military judge question the accused about his actions and intentions in order to determine whether his actions constitute the offenses to which he is pleading guilty." *United States v. Wimberly*, 20 C.M.A. 50, 51, 42 C.M.R. 242, 243, 1970 WL 7057 (1970).

In *Wimberly*, the Court held that the military judge met the *Care* standard through his "interrogation technique" that related the accused personally to the criminal act, followed by the accused admitting to the military judge that the elements the judge had itemized accurately described what he had done. While our superior Court was not overly pleased with the military judge's technique of questioning the accused with long questions that often covered more than one action or element, it found the interrogation-style inquiry to "marginally" comply with the *Care* requirements. In the inquiry in *Wimberly*, with the exception of his answer to a query asking him if he had any questions, the accused answered every question asked by the military judge with the same simple response: "Yes, Your Honor." *Wimberly*, 20 C.M.A. at 52–55, 42 C.M.R. at 244–47.

In *Jordan*, our superior Court cited its decision in *United States v. Sweet*, 42 M.J. 183 (C.A.A.F.1995), a case in which the military judge's inquiry was found to have satisfied the requirements of *Care*.[9] In *Jordan*, the Court noted that during the providence inquiry in *Sweet*, the accused's " 'yes' and 'no' answers to the military judge's inquiry responded to *questions of fact* and not just conclusions of law." *Jordan*, 57 M.J. at 239 (emphasis added).

■ In this case, while most of Appellant's answers to the military judge's questions consist primarily of: "Yes, sir," our primary focus is not on the length or the brevity of Appellant's answers. Rather, we must determine whether the military judge properly established on the record a factual basis for a provident plea by Appellant. The military judge's providence questions in this case were not mere legal conclusions, such as "Did you mail obscene material?" Rather, among other things, they established that:

(1) the letter contained the language alleged;

(2) Appellant, freely, knowingly, and wrongfully wrote and mailed the letter to the Marine Corps Federal Credit Union branch in North Carolina;

(3) Appellant did not know who at the credit union might receive the letter;

(4) it was not sent as a joke, but out of frustration at not getting a desired loan;

(5) Appellant knew it would probably offend the individual who would read it at the credit union;

(6) while Appellant did not actually desire that someone at the credit union "kiss [his] rear end," he did intend to "convey the message though that someone there at the Marine Corps Federal Credit Union could kiss [his] rear end and commit sodomy on [him];"

(7) after hearing the military judge once again define the term "obscene," which included an explanation of the appropriate military-community standard by which to consider the language, Appellant acknowledged that the language he used in the questioned letter fit that definition;

---

**9.** *Sweet*, 42 M.J. at 185–86.

(8) the conduct was of a nature to bring discredit upon the armed forces;

(9) the members of the credit union who read Appellant's letter would look down on the United States Marine Corps for him having written "this grossly vulgar and obscene matter;"

(10) Appellant believed individuals at the credit union were "grossly offended" by his letter; and

(11) perhaps most importantly for the resolution of this case, Appellant acknowledged that the language used in the letter was "calculated to corrupt morals or excite lustful thoughts."

Record at 32–37.

Thus, based on the "totality of the circumstances" contained in the Record, we conclude that the providence inquiry in this case complied with the requirements of *Care* and its progeny. Concerning Appellant's issue with the definition of "obscene" used by the military judge during the providence inquiry, and the factual basis developed to support his guilty plea based upon it, as amplified below, we find that it adequately covers the definition provided in MCM, Part IV, ¶ 89c *and* the test adopted by our superior Court in *French*, as reaffirmed and expanded somewhat in *Brinson.*[10]

### V. Was Appellant's Letter *Legally* Obscene?

■ The substantive issue in this case is whether the content of the letter Appellant mailed to the credit union meets the established military test to determine if the language is "obscene" for the purposes of constituting a criminal offense. We start with MCM, Part IV, ¶ 94, which addresses the offense of depositing obscene matters in the mails. Subparagraph c, states: "Whether something is obscene is a question of fact. 'Obscene' is synonymous with 'indecent' as the latter is defined in paragraph 89c. The matter must violate community standards of decency or obscenity and must go beyond customary limits of expression." The applicable and relevant community standards "for measuring whether language is indecent are

those of the military community." *Hullett,* 40 M.J. at 191. At MCM, Part IV, ¶ 89c, which addresses the related offense of "indecent language," the following explanation is provided:

"Indecent" language is that which is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought. Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts. The language must violate community standards.

During the providence inquiry in this case, the military judge twice defined the word "obscene" for Appellant as:

[T]hat form of immorality relating to sexual impurity which is not only grossly vulgar and repugnant to common propriety, but which tends to excite lust and deprave the morals with respect to human relations.

The matter must violate community standards of decency or obscenity and must go beyond customary limits of expression. The community standards of decency or obscenity are to be judge[d] according to the average person in the military community as a whole rather than the most prudish or tolerant.

Record at 36; *see also* Record at 16.

We note that this definition of "obscene" actually is taken from the definition of "indecent" contained in the MCM for the offense of indecent acts with another. MCM, Part IV, ¶ 90c. In providing this definition, the military judge gave the definition of "obscene" contained in the then current Military Judges' Benchbook for use with the offense of depositing obscene matter in the mail.[11] As noted above, the shadow of this pronouncement of what is "obscene" adequately covers both the definition provided in MCM, Part IV, ¶ 89c *and* the test for obscenity adopted by our superior Court in *French* and

---

10. *French,* 31 M.J. at 59; *Brinson,* 49 M.J. at 364.

11. Military Judges' Benchbook, Dept. of the Army Pamphlet 27–9 at 648 (Ch 2, 15 Oct 99).

reaffirmed and expanded somewhat in *Brinson*.[12]

The definition and consideration of "obscenity" necessarily implicates the Constitutional right to "free speech." This right—including even that "speech" which some might hear in their own ear as "offensive," "vulgar," or "indecent"—is a precious, jealously-guarded, Constitutionally-protected right,[13] and "[w]hen the Government makes speech a crime, the judges on appeal must use an exacting ruler." *Brinson*, 49 M.J. at 361. Our superior Court has provided us with a "exacting ruler," with *French* and *Brinson* setting its perimeters.

The Constitution states that "Congress shall make no law ... abridging the freedom of speech...." U.S. CONST. amend. I. However, as the Supreme Court has concluded:

> "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. *These include the lewd and obscene.... It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be deprived from them is clearly outweighed by the social interest in order and morality....*"

*Roth*, 354 U.S. at 485, 77 S.Ct. 1304 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)). The Supreme Court in *Roth* went on to say: "We hold that obscenity is not within the area of constitutionally protected speech or press." *Roth*, 354 U.S. at 485, 77 S.Ct. 1304.

While the service appellate courts previously "wrestled with the problem of indecent and obscene language," our superior Court first addressed the issue in its 1990 decision in *French*.[14] The central issue in *French* involved the sufficiency of a specification alleging indecent language spoken to a child under age 16, where the accused had asked his 15-year-old stepdaughter "'if he could climb in bed with her.'" *French*, 31 M.J. at 58. The specific issue the Court examined was whether the military judge erred in denying a defense motion to dismiss the questioned specification for failure to state the offense of indecent language, in that the words allegedly spoken were not legally indecent. *Id.*

Acknowledging the difficulties inherent in the issue of deciding "what is indecent or obscene against a constantly changing set of societal mores and values,"[15] *id.* at 59, the Court in *French* examined various authorities, determining that:

(1) "Under certain circumstances a particular act may be entirely innocent; under other conditions the same act may be a violation of the Uniform Code." *Id.* (quoting *Holland*, 12 C.M.A. at 445, 31 C.M.R. at 31);

(2) "'[t]he sufficiency of a specification to allege communication of indecent or obscene language, however, does not require that the words allegedly uttered by the accused be indecent or obscene *per se*, for even chaste words may be made the medium of expressing obscene thoughts ....'" *Id.* at 59–60 (quoting *United States v. Wainwright*, 42 C.M.R. 997, 999, 1970 WL 7286 (A.F.C.M.R.1970)), *aff'd on other grounds*, 20 C.M.A. 183, 43 C.M.R. 23, 1970 WL 7418 (1970); and

(3) in determining if the alleged language is legally obscene, a number of factors must be considered, such as the "'relationship existing between a given speaker and his [or her] auditor, ...

---

12. *French*, 31 M.J. at 59; *Brinson*, 49 M.J. at 364.

13. *See* JETHRO K. LIEBERMAN, THE EVOLVING CONSTITUTION 358–60 (1992).

14. While *French* is the first time the Court had specifically considered the issue of what is indecent *language* under the UCMJ, it previously had addressed what constitutes an indecent *act*. *French*, 31 M.J. at 59 (citing *United States v.*

*Holland*, 12 C.M.A. 444, 445, 31 C.M.R. 30, 31, 1961 WL 4516 (1961)).

15. The Court quoted Supreme Court Justice Potter Stewart's famous statement that while it is very difficult to define the kinds of material that are obscene, "'I know it when I see it ....'" *French*, 31 M.J. at 59 (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964)(Stewart, J., concurring)).

and the probable effect of the communication' as deduced from the four corners of the specification." *Id.* at 60 (quoting *Linyear*, 3 M.J. at 1030).

Looking at relevant decisions of the courts of military review, our superior Court adopted the test that had been used by the lower courts in determining if questioned language is legally indecent: " '[W]hether the particular language is calculated to corrupt morals or excite libidinous thoughts.' " *French*, 31 M.J. at 60 (quoting *Linyear*, 3 M.J. at 1030).

Applying that test to the facts in its case at hand, the Court in *French* concluded that— based on the context of the question—the accused asking his 15–year–old stepdaughter if he could climb into bed with her was indecent language, and, thus, the specification adequately stated the offense of communicating indecent language. The Court stated: "Each word individually is chaste, if not innocuous. As a whole, however, the language certainly conveys an indecent message." *French*, 31 M.J. at 60.

In *Brinson*, our superior Court reaffirmed and elaborated on the totality-of-the-circumstances test it had adopted in *French*, by defining "calculated" as generally meaning " 'intend[ed]' or 'plann[ed]' to bring about a certain result." *Brinson*, 49 M.J. at 364. The Court said: "A determination whether language was intended to corrupt morals or excite libidinous thoughts cannot be made in isolation from the other evidence in the record. Instead, we must examine the entire record of trial to determine the precise circumstances under which the charged language was communicated." *Id.* at 364. The Court cited to MCM, Part IV, ¶ 89c, as providing the Presidential explanation as to what constitutes "indecent language" for purposes of UCMJ offenses. The Court indicated, however, that the guidance provided in the MCM "does not stand alone in explaining what indecent language is for the purposes of Article 134." *Id.*

In *Brinson*, the relevant events took place at 0312, after the accused had returned from a night at the base club. When approached by security personnel, who were in the barracks for an unrelated matter, the accused—

a male Airman Basic, USAF—was involved in a heated exchange with a female, which included screaming and swearing, about the accused's relationship with another woman. When directed by law-enforcement personnel to cease and desist, the accused, already angry, channeled his heightened displeasure via a verbal barrage toward the security personnel. Thus, in *Brinson*, the accused, in a highly-animated and emotional state, continued an already-in-progress "swearing" tirade, which he redirected towards security personnel, who first attempted to calm him down and then, that failing, apprehended him. *Id.* at 361–62.

Applying the *French* particular-circumstances test, the Court concluded that while the foul language the accused directed toward security personnel might be disorderly conduct, it was not "indecent" language, because—under the precise circumstances by which the charged language was communicated—it was not "intended to corrupt morals or excite libidinous thoughts," but rather to express the accused's anger. *Id.* at 364–65.

Juxtapose that circumstance with the facts of this case, where Appellant was not faced with an immediate, in-your-face, angry confrontation, which quickly escalated out of control at 0312 after a night at the base club. While Appellant might have us believe that his writing the letter to the credit union in anger should give him the heat-of-anger indecent-language exception afforded the accused in *Brinson*, we infer deliberation in his conduct, which distinguishes it from the facts and circumstances in *Brinson*. Rather than being involved in a quick-and-immediate flurry of acrimonious activity, which fueled the excited utterances of anger by the accused in *Brinson*, the circumstances and stepped-process of Appellant's offensive conduct provided him with the opportunity to reflect and consider, a circumstance not present in *Brinson*. In this case, Appellant made a deliberate decision to write a letter to the credit union; found the necessary items, such as a pen, some paper, an envelope, and a stamp; wrote the letter, with conscious thought as to content; got the letter ready to mail; traveled from wherever he actually wrote the

letter to the United States mailbox located in front of the Camp Hansen Post Office; and physically deposited the letter in that mailbox. Record at 32–34.

Thus, while a determination of "obscenity" does not turn, in and of itself, on a spontaneity-deliberation distinction, it does factor into the "particular circumstances" aspect of the inquiry. There is nothing in the circumstances of this case to suggest that Appellant's intended meaning was anything less than his actual words would indicate to the reader.

Additionally, there is a significant difference in the actual language used by Appellant in this case, and that spoken by the accused in *Brinson*, in which the "F" word, along with its gerund and other derivations, was the primary expletive expression of choice. As sad and as unwelcome as it may be, as a culture we have become somewhat desensitized to the "F" word, and, regrettably, it seems to be on the fringe of the older, long-established group of recognized and perhaps somewhat more "acceptable" commonly-used expletives, such as "hell," "damn," and "s___." [16] Thus, in a state of agitation, anger, and, more than likely, some degree of intoxication, the accused in *Brinson* was deemed merely to have been swearing, when he used the perhaps offending, but-not-under-the-circumstances-legally-obscene words.

The same cannot be said, however, about the words and phrases Appellant used in this case. Applying the appropriate military "community standard," we do not find that Appellant's words of choice have reached the same commonly-used-as-an-expletive status as the "F" word. How often, when hitting a thumb with a hammer, or upon spilling hot, greasy gravy on a new shirt or skirt, is one heard to blurt: "Oh, *[the 'B' word]* !"? The words and phrases Appellant used in his offending letter to the credit union are not seen or heard by most people to be just commonly-used expletives reflecting sudden, strong emotion or intensity of feelings.[17] Rather, Appellant's explicit and descriptive words invoke the image of the sexual act itself. Not only did Appellant include the common slang word used to identify this sexual act, but in order to make the picture he intended to paint perfectly clear, he also included a phrase that provides a very graphic description of the act itself. In the providence inquiry, Appellant admitted that he "intended to offend them," by conveying the message that the credit union personnel could commit sodomy on him. Record at 36.

We agree with Appellant, when he indicates that his word selection was geared to generate maximum shock value.[18] What provides a bigger shock than some totally-unsuspecting individual opening what appears to be a routine business letter, only to have, quite unexpectedly, vivid and shocking obscenity leap off the page at them? We find there is both a quantitative and a qualitative difference between the name calling engaged in by the accused in *Brinson* and the Appellant's graphic description of a specific sex act in this case. Thus, this Court concludes Appellant's words violated the military-community-standards aspect of the indecent-language test, as well as more than meeting the *French/Brinson* test of having been "calculated to corrupt morals or excite libidinous thoughts." [19] *French*, 31 M.J. at 60.

---

**16.** This discussion should not be misinterpreted as being an "endorsement" or validation of any expletive, "commonly-used" or otherwise.

**17.** *See Brinson*, 49 M.J. at 367 (Cox, C.J., concurring). None of the questionable words or phrases used by Appellant in his letter in issue are included in then Chief Judge Cox's list of "well-known 'four letter words.'"

**18.** Appellant's Brief of 18 Sep 2001 at 7–8; Appellant's Answer on Reconsideration of 16 Jul 2002 at 2, 18–19.

**19.** One definition of "incite" is "stir up." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 665 (1976). For most individuals, the very descriptive nature of Appellant's operative words and phrases upon reading—even if totally "involuntary" and only fleetingly—will "incite libidinous thoughts," in that the mental imagine of the described act will flash through one's mind. This is not to imply a reader of Appellant's letter would or even needs to "welcome" that mental image for those descriptive words to pass the "incite libidinous thoughts" test for indecent language. That those thoughts be "stirred" by the offending language will suffice.

We find Appellant's language "passes" the legally-obscene test, as he exceeded the "customary limits of expression." MCM, Part IV, ¶ 94c. As now modified and applied, the test for indecent language, as set out in the MCM, is whether the questioned language, which must also violate community standards, "tends reasonably to corrupt morals or incite libidinous thoughts." MCM, Part IV, ¶ 89c. The Drafter's Analysis of Punitive Articles indicates that the 1995 MCM Amendment modified the *French* test by substituting the term "tends reasonably" for the term "calculated to," in order "to avoid the misinterpretation that indecent language is a specific intent offense."[20] MCM, App. 23, at A23–19. The notion that Appellant would write a letter indicating a desire to have the reader sodomize him cannot be anything other than morally corrupting.

"Morals" is defined as: "Rules or habits of conduct, especially sexual conduct, with reference to standards of right and wrong." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 852 (1976). Appellant had no idea who might open and read his letter when it arrived at the credit union.[21] Nevertheless, Appellant knew or should have known that his letter might have an adverse impact on the morals of that individual recipient. While "the probable effect of the communication" is a factor to be considered in an indecent-language determination,[22] we have no evidence in this guilty-plea record as to the actual reaction of the credit union personnel when they read the contents of Appellant's letter. However, the mere fact that he was charged with mailing obscene matters via this item of business correspondence creates an inference that the reaction was sufficiently negative that credit union personnel were moved to inform Marine Corps officials of the nature of the letter.[23]

Thus, it is enough, as in this case, that Appellant specifically intended to write the questioned words that he included in the letter, which he then consciously mailed to the credit union. The use of "indecent language" not being a specific intent crime, it is sufficient that the language used "tends reasonably to corrupt morals or incite libidinous thoughts." MCM, Part IV, ¶ 89c. It is important to note that while Appellant now attributes his letter-writing motivation to just being angry, at trial, under oath, he responded affirmatively when specifically asked by the military judge: "Do you believe and admit that this language used in your letter was calculated to corrupt morals or excite lustful thoughts?" Record at 16–17, 37.

Both *French* and *Brinson* cite to *Linyear* as providing the appropriate test for measuring whether questioned language is legally indecent. In *Linyear*, this Court, after stating the "true test of verbal obscenity" concluded:

The necessary attribute of indecency or obscenity can, therefore, be said to be adequately alleged if the language employed by the accused when reasonably construed by community standards, serves to *convey* a libidinous message whether or not the words themselves are impure.

*Linyear*, 3 M.J. at 1030 (emphasis added).

Clearly Appellant's letter *conveyed a libidinous message*, both as to the medium by which it was transmitted to credit union personnel, and through the clear, literal meaning and message of the words themselves. It vividly carried the message Appellant intended to send. Consider the following exchange that took place between the military judge and Appellant during the providency inquiry,

---

**20.** To the extent that Judge Harris is suggesting in his attached concurring/dissenting opinion that "excited lust" on the part of Appellant is an element of the offense, we disagree.

**21.** "[T]he notion of obscenity focuses on the listener or recipient of the information. Obscenity laws are intended to protect listeners from offensive speech. To characterize a message as obscene is to say that listeners should be protected from the speech in a particular context." TIMOTHY JAY, CURSING IN AMERICA 13 (1992).

**22.** *Linyear*, 3 M.J. at 1030.

**23.** The likelihood that the reader reaction to Appellant's letter was adverse is supported by the recognized offensiveness of Timothy Jay, Ph.D., the phrase "b_____ j_____," ranked extremely high for its offensive nature. Of 155 words, phrases, or actions considered, it was the sixth most offensive individual word or phrase. JAY, CURSING IN AMERICA 162 (1992).

after Appellant acknowledged that some of the descriptive language he included in the letter is slang terms for sodomy:

MJ: Now, "sodomy" means for a person to take into that person's mouth the sexual organ of another person. Now, is that the message that you were trying to convey?

ACC: Yes, sir.

MJ: Okay. So was the message that you were trying to convey to the Marine Corps Federal Credit Union that they were mean people who could kiss your rear and commit sodomy on you?

ACC: Yes, sir.

Record at 36. Based on the relative positions and stature of the two speakers, some may read the above colloquy with a degree of skepticism, in that it reflects an enlisted servicemember responding with "expected" affirmative responses to the questions addressed to him by a senior officer sitting in judgment of him as a military judge. It should be noted, however, that at the time of his court-martial, Appellant was a 22-year-old Marine Corps noncommissioned officer (NCO) with almost 4 years of military service, and he was well-represented at trial by a Marine Corps Major, who at the time, was the senior Marine Corps defense counsel in Okinawa. Charge Sheet; Record at 3; Staff Judge Advocate's Recommendation of 17 Nov 2000 at 3.

Conceptually, this case is different from most of the precedent-setting indecent-language cases, in that in many of those cases the salient issue was one of the following: (a) whether relatively innocuous words can be legally obscene, given the context in which they were used; (b) does the-use-of-coarse-language-among-friends circumstance negate the potential criminality of the words; or (c) while they might be chargeable as some other UCMJ offense, do the circumstances in which the words were spoken—such as in the midst of an immediate anger-filled confrontation—eliminate the possibility of pursing a potential "indecent language" offense?[24] At-

tempting to minimize his letter, containing the strong, vivid language that on its face reflects its obscene nature, Appellant tries to shoehorn his case into this third category. His effort is hampered, however, by the lack of the in-the-heat-of-the-moment factor in his case. While he was angered at the refusal of the credit union management to give him a loan, so that he could camouflage his offense by replacing the funds he had wrongfully appropriated, the circumstance of his anger did not take the immediate, incendiary form inflaming the accused in *Brinson*, to the extent that the circumstances changed the complexion and effect of the words used.

While not specifically addressed as an issue in the major precedent-setting cases involving indecent language, the fact that Appellant's questioned language was in written form vice being spoken is a valid factor to be considered. The limiting concerns expressed by Judge Sullivan and (then) Chief Judge Cox in their majority and concurring opinions, respectively, in *Brinson* primarily center around not wanting to criminalize as indecent language—although such words might form the basis of other UCMJ violations—words spoken either in immediate anger or as mere banter, coarse as it might be, among those who do not consider it as being criminally obscene. *Brinson*, 49 M.J. at 364, 367–68. These concerns, however, are alleviated by the written and "business letter" nature of Appellant's challenged communication, which he consciously launched to unknown readers. Appellant's letter paints a vivid word portrayal of a crude expression of sexual deviance. While anger might have been a motivational factor in Appellant writing and mailing the letter, it *was intended* to disrupt moral values.

## VI. Alternate Offenses

We note that while we conclude herein that the words contained in Appellant's letter, in fact, do meet the current *French/Brinson* test for obscenity, if we had concluded otherwise, the facts established in this guilty-plea case would *not* sustain a conviction of the

---

24. *See generally: (a) United States v. French*, 31 M.J. 57 (C.M.A.1990); *United States v. Linyear*, 3 M.J. 1027 (N.C.M.R.1977); *United States v. Wainwright*, 42 C.M.R. 997, 1970 WL 7286 (A.F.C.M.R.1970); and *United States v. Simmons*, 27 C.M.R. 654, 1959 WL 3663 (A.B.R.1959); (b) *United States v. Hullett*, 40 M.J. 189 (C.M.A.1994) and *United States v. Prince*, 14 M.J. 654 (A.C.M.R.1982); and (c) *United States v. Brinson*, 49 M.J. 360 (C.A.A.F.1998).

closely-related offense of disorderly conduct. The case facts and court-martial record, however, do lend themselves to a finding that Appellant's guilty plea—as discussed above—is sufficient to support his conviction for service-discrediting conduct under Article 134, clause 2, UCMJ. In *United States v. Sapp*, 53 M.J. 90, 91–92 (C.A.A.F.2000), the Court held:

> Conduct is punishable under Article 134 if it prejudices "good order and discipline in the armed forces" (clause 1), or if it is "of a nature to bring discredit upon the armed forces" (clause 2), or if it is a crime or offense not capital (clause 3). The three clauses do not create separate offenses. Instead, they provide alternative ways of proving the criminal nature of the charged misconduct.
>
> It is clear from reading Article 134 that conduct which violates no specific statute may still be an offense thereunder if it is found to be prejudicial to good order and discipline of if it is of a nature to bring discredit upon the armed forces.

Clearly the record in this case would support Appellant's conviction for a violation of Article 134, clause 2, as the nature of his acknowledged conduct speaks for itself, and he admitted during the providence inquiry that his actions were service discrediting.

## VII. Sentence Appropriateness

■ Even setting aside, for argument's sake, Appellant's questioned conviction for depositing obscene matter in the mail, we are still left with his conviction for wrongfully appropriating over $1,500.00 from the post office on divers occasions and for making and uttering a worthless check for $500.00. The fact that at the time of the offenses Appellant was a Marine Corps NCO, standing alone, is a significant sentencing factor.[25] *United States v. Thompson*, 22 M.J. 40, 41 (C.M.A. 1986). During the providence inquiry, Appellant stated he was aware that his status as an NCO was significant. Record at 39. The seriousness escalates significantly, however, when Appellant's special status of trust and confidence within the Marine Corps as an NCO is coupled with the fact he took money—a total of $1,500.00—on several occasions from the very post office fund for which he had been entrusted with a fiduciary responsibility.

This Court has considered the positive character references throughout the Record and Appellant's almost 4 years of honorable service prior to his court-martial, during which he had service-average marks of 4.5 (Proficiency) and 4.1 (Conduct) and no disciplinary action. Staff Judge Advocate's Recommendation of 17 Nov 2000 at 3; Prosecution Exhibit 1. Having considered that, we conclude that the approved sentence is not inappropriately severe, given the nature and seriousness of the offense and the character of the offender. *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A.1982).

## VIII. Recommendation

Although reaching a different ultimate conclusion in deciding the indecent-language issue, the majority opinion in this Court's original decision in this case, made a direct request to our superior Court when it stated:

> However, we believe that the *Brinson* dissent is persuasive. Accordingly, we urge our superior Court to reevaluate the restrictive "calculated to corrupt morals or excite libidinous thoughts" test. If the revolting language used by this Marine cannot be considered legally obscene, we would be hard pressed to imagine what language would pass an objective test.

*United States v. Negron*, No. 200100844, 2002 WL 436776 (N.M.Ct.Crim.App. 14 Mar 2002)(unpublished op. at 6).

While this Court, in this decision, appositely concludes that—based on the particular

---

**25.** "To the men under him, the Marine NCO must constantly set an example of professional skill and purpose. To officers, the noncommissioned officer must always be a strong right arm and a partner in leadership.... If I could give only one sentence of counsel to all officers of our Corps, I would say: 'Help your NCOs, know your NCOs, and trust your NCOs.' If I were equally limited to a single statement of advice to all Marine noncommissioned officers, and to those who aspire to join their ranks, it would be: 'Hold high the trust placed in you....'" General L.F. Chapman, Jr., USMC, Commandant of the Marine Corps, *Foreword* to COLONEL ROBERT D. HEINL, JR., HANDBOOK FOR MARINE NCOs (1970).

and specific facts and circumstances of this case—the language Appellant used in his letter to the credit union is legally obscene under current controlling precedent, we echo the request, cited above, that our superior Court reevaluate the restrictive "calculated to corrupt morals or excite libidinous thoughts" test for obscene language.

## IX. Submission of Appendix A in Support of Request

Appendix A is offered in support of the above request. While certainly honoring the doctrine of *stare decisis*, it is respectfully submitted in the belief that this Court should be able to clearly communicate to our superior Court its position on an issue of importance and concern within the military-justice system, and it is offered in the spirit of our superior Court's guidance offered in *United States v. Allbery*, 44 M.J. 226, 228 (C.A.A.F. 1996), that a Court of Criminal Appeals should "express [its] viewpoint and urge [ ] our reconsideration of our precedent." [26]

## X. Conclusion

Accordingly, based on the discussion above, we affirm the findings of guilty and the sentence, as approved on review below.

Chief Judge LEO concurs.

BRYANT, Judge, with whom Senior Judge FINNIE, Judge CARVER, and Judge RITTER join (concurring in Parts I–VII and X, and dissenting as to Parts VIII–IX and the Appendix):

I concur with the majority's resolution of this case for the reasons stated by Judge Villemez. I write separately to note my disagreement with the lead opinion in two respects.

I disagree with the recommendation to our superior Court contained in Parts VIII, IX, and Appendix A of their opinion. As the lead opinion conclusively establishes, there are distinct factual differences between this case and the factual events in *United States v. Brinson*, 49 M.J. 360 (C.A.A.F.1998). Under the circumstances of this case, Appellant's words were obscene. The lead opinion amply demonstrates that the "restrictive"

language of *Brinson* is fully capable of encompassing the reprehensible words akin to that used by Appellant, and yet protects Sailors and Marines from being criminally liable for the mere use of coarse language used under volatile circumstances. *Brinson*, 49 M.J. at 364. While I personally find (now) Chief Judge Crawford's dissent in *Brinson* persuasive, I do not believe that this case is an appropriate vehicle for this Court to request reevaluation of the standards established in *Brinson*.

I also disagree with the lead opinion insofar as it could give the impression that this Court now believes that the " 'F' word" has become a commonly used, socially acceptable expletive. I disassociate myself from any such impression.

HARRIS, Judge, with whom Senior Judge OLIVER joins (concurring in Parts I, II, VI–IX and the Appendix, and dissenting as to Parts III V and X):

I concur with the majority's decision to affirm the findings of guilty of wrongful appropriation and making and uttering a worthless check. As to the majority's affirmance of the findings of guilty of depositing obscene matter in the mail, I respectfully dissent. I would hold that the evidence in the record is not legally sufficient to support Appellant's conviction for the offense of placing obscene matter in the mail. I would, however, support a conviction for the lesser included offense of service-discrediting conduct, also a violation of Article 134, UCMJ, and reassess the sentence.

The standard of review to determine whether a guilty plea is provident is whether the record reveals a substantial basis in law and fact for questioning the plea. *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991). In my opinion, there is a substantial basis for questioning Appellant's plea. The dispositive question in Appellant's case, as identified by Senior Judge Price in his concurring and dissenting opinion, is whether the language in Appellant's letter to Marine Corps Federal Credit Union (MCFCU) personnel is "obscene" (indecent) as a matter of

26. *See also United States v. Kelly*, 45 M.J. 259, 262 (1996).

military criminal law. As indecency is a question of fact, I would hold that, based on the record in Appellant's case, the record is insufficient to show the language communicated by Appellant to MCFCU personnel was indecent.

The military judge explained to Appellant that the word "obscene" means:

[T]hat form of immorality relating to sexual impurity which is not only grossly vulgar and repugnant to common society, but which tends to excite lust and deprave the morals with respect to sexual relations.

The matter must violate community standards of decency or obscenity and must go beyond customary limits of expression. The communities' standards of decency or obscenity are to be judged according to the average person in the military community as a whole rather than the most prudish or tolerant.

Record at 16, 36.

While it is clear that the language intentionally communicated by Appellant to MCFCU personnel would, when taken in the proper context, normally deprave the morals with respect to sexual relations and went far beyond what would be considered customary limits of expression, the matter must also have violated community standards of decency or obscenity. In my opinion, the record fails to adequately establish that Appellant intended his grossly vulgar and clearly repugnant language to excite lust in those MCFCU personnel who would receive and perceive the communication. More importantly, the record fails to establish that this language would even tend to excite lust in or deprave the morals of any MCFCU personnel who received and perceived Appellant's communication. Indeed, although not an element of the offense, this language would not tend to excite lust in Appellant at the time he sent the communication to MCFCU personnel. In other words, when taken in its proper context, it cannot be said, "the particular language was calculated to excite libidinous thoughts." *United States v. French,* 31 M.J. 57, 60 (C.M.A.1990). Our superior Court more than made it clear that when applying that test, a court should consider all of the relevant facts of the record, not just the language contained in the particular specification.

In *United States v. Brinson,* 49 M.J. 360, 363 (C.A.A.F.1998), our superior Court held that the language communicated by the appellant, to wit: "F... you, you white mother f.....": "get me the f ... off the ground, it's cold; take these f ....... chains off of me, I'm going to walk to the f...... car"; "white mother f......."; and "you can't treat me like niggers," or words to that effect, was intended by the appellant to express rage, not "sexual desire or moral dissolution," and affirmed only a guilty finding of a lesser-included offense of disorderly conduct. *Id.* at 364–65. In Appellant's case, when responding to question's by the military judge during the providence inquiry, Appellant told the military judge, "I was just angry and I intended to offend them and get back at them for denying me," and "I wasn't paying so much attention to the technical definition of what it was, sir, I just threw the word out to offend them." Record at 35.

Although, in my opinion, the providence inquiry in Appellant's case was not sufficient to establish the offense of depositing obscene matter in the mail, I still conclude that it was sufficient to establish the lesser-included offense of service-discrediting conduct. *See United States v. Sapp,* 53 M.J. 90, 92 (C.A.A.F.2000). In making the determination that the providence inquiry in Appellant's case was sufficient to establish the lesser-included offense of service-discrediting conduct, I had to answer the following three questions:

1. May conduct that violates no specific statute still be an offense under Article, 134, UCMJ, if it is found to be prejudicial to good order and discipline?

2. Was Appellant's guilty plea sufficient to support his conviction of service-discrediting conduct under Article 134, UCMJ, where he pleaded guilty to depositing certain matter in the mail as a violation of Article 134, UCMJ; and admitted that his conduct was service discrediting?

3. If this Court cannot affirm the findings announced by the military judge, can we modify the military judge's findings to

make them consistent with Appellant's pleas if the record contains a sufficient factual basis to support such findings?

I answer all three questions in the affirmative. Having been given the elements for the offense of depositing obscene matters in the mail, Appellant recited a sufficient factual basis for that offense during the providence inquiry. The offense of service-discrediting conduct is undoubtedly a lesser-included offense to the offense to which Appellant entered pleas of guilty. *See generally Brinson,* 49 M.J. at 364–65. Further, I see no constitutional infirmities in the conviction in this case based on the technical discrepancy between the pleas and the findings. Based on the foregoing, I conclude that Appellant suffered no prejudice. Art. 59(a), UCMJ.

Appellant's abhorrent conduct under the circumstances was of a nature to bring discredit upon the armed forces and, not to mention, prejudicial to good order and discipline in the armed forces. MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.), Part IV, ¶¶ 60c (2)(a) and (3); *see Sapp,* 53 M.J. at 92.

I would amend the specification of Additional Charge II to read as follows:

In that Corporal Wesley B. Negron, U.S. Marine Corps, Headquarters and Service Battalion, Marine Corps Base, Camp Smedley D. Butler, Okinawa, Japan, on active duty, did, at Okinawa Japan, on or about 10 April 2000, communicate in writing by mail to an unknown person or persons, personnel of a Marine Corps Federal Credit Union branch office in North Carolina, certain language, to wit: "Oh yeah, by the way y'all can kiss my ass too!! Worthless bastards! I hope y'all rot in hell you scumbags. Maybe when I get back to the states I'll walk in your bank and apply for a blow job, a nice dick sucking, I bet y'all are good at that, right?" or words to that effect, which conduct was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

I would reassess the sentence and approve the adjudged sentence that includes a bad-conduct discharge, reduction to pay grade E-1, forfeitures of all pay and allowances, and 18 months confinement. The reprehensible offenses Appellant, a noncommissioned officer, committed, strike at the heart of good order and discipline and justify the approval of my reassessed sentence.

Finally, I concur with the final paragraph of Judge Price's concurring and dissenting opinion urging our superior Court to reevaluate the restrictive "calculated to corrupt the morals or excite libidinous thoughts" test.

PRICE, Senior Judge, (concurring in Parts I, II, VII, and VIII, and dissenting as to Parts III–VI, IX, X, and the Appendix):

I concur with the majority's decision to affirm the findings of guilty of wrongful appropriation and making and uttering a worthless check. As to the majority's affirmance of the findings of guilty of depositing obscene matter in the mail, I respectfully dissent. Given the binding precedents of our superior Court, I reluctantly conclude that there is a substantial basis to question the appellant's guilty pleas and findings to the offense of placing obscene material in the mail. I would set aside those findings and reassess the sentence.

A military judge may not accept a guilty plea to an offense without inquiring into its factual basis. *United States v. Care,* 18 C.M.A. 535, 541, 40 C.M.R. 247, 253, 1969 WL 6059 (1969); *see* Art. 45(a), UCMJ. Before accepting a guilty plea, the military judge must explain the elements of the offense and ensure that a factual basis for the plea exists. *United States v. Faircloth,* 45 M.J. 172, 174 (C.A.A.F.1996). Mere conclusions of law recited by the accused are insufficient to provide a factual basis for a guilty plea. *United States v. Outhier,* 45 M.J. 326, 331 (C.A.A.F.1996). The standard of review to determine whether a guilty plea is provident is whether the record reveals a substantial basis in law and fact for questioning the plea. *United States v. Prater,* 32 M.J. 433, 436 (C.M.A.1991). As succinctly stated by the appellant, "[t]he pertinent question in this case is whether the language in Corporal Negron's letter is 'obscene' as a matter of military criminal law." Appellant's Brief of 18 Sep 2001 at 5.

The elements of the offense of Depositing Obscene Matters in the Mail are:

1. That the accused deposited or caused to be deposited in the mails certain matter for mailing and delivery;

2. That the act was done wrongfully and knowingly;

3. That the matter was obscene; and

4. That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

MANUAL FOR COURTS-MARTIAL, UNITED STATES, (2000 ed.), Part IV, ¶ 94b. "Whether something is obscene is a question of fact. 'Obscene' is synonymous with 'indecent' as the latter is defined in paragraph 89c. The matter must violate community standards of decency or obscenity and must go beyond customary limits of expression." *Id.* at ¶ 94c. Under paragraph 89c, which addresses the related offense of Indecent Language, the following explanation is provided:

'Indecent' language is that which is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought. Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts. The language must violate community standards.

I note that the second sentence of this explanation was inserted by the 1995 Amendment of the Manual for Courts-Martial in view of the new test for indecent language adopted by the Court of Military Appeals in *United States v. French*, 31 M.J. 57 (C.M.A.1990). MCM (1995 ed.), App. 23, at A23–19.

In *French*, our superior Court squarely addressed the test for indecent/obscene language for the first time. After citing various authorities,[1] the Court adopted the following test: "**whether the particular language is calculated to corrupt morals or excite libidinous thoughts.**" *French*, 31 M.J. at 60

(emphasis added). The Court also made it clear that, in applying that test, it would consider all of the relevant facts of record, not just the four corners of the specification.

Since *French*, the only decision from our superior Court that is on point is *United States v. Brinson*, 49 M.J. 360 (C.A.A.F. 1998). Airman Basic Brinson was convicted of communicating indecent language, to wit, "F... you, you white mother f.....; "get me the f... off the ground, it's cold; take these f...... chains off of me, I'm going to walk to the f...... car"; "white mother f.......": and "you can't treat me like niggers," or words to that effect. *Id.* at 363. According to the testimony, Brinson uttered this language as he was being apprehended by a law enforcement officer. After summarizing the findings, sentence, and post-trial review of the case, the Court opened its analysis with this significant statement: "When the Government makes speech a crime, the judges on appeal must use an exacting ruler." *Id.* at 361. With that caution in mind, I note the following elaboration of the *French* test: " 'Calculated' is generally understood to mean 'intend[ed]' or 'plan[ned]' to bring about a certain result. *See Webster's New Collegiate Dictionary* 196 (1991)". *Id.* at 364. The Court decided that Brinson's use of such language was intended to express rage, not "sexual desire or moral dissolution" and affirmed only a guilty finding of a lesser included offense of disorderly conduct. *Id.* at 364–65.

I note that then-Judge Crawford, joined by Judge Gierke, dissented from this holding. She said,

Paragraph 89c, Part IV, Manual for Courts-Martial, United States (1995 ed.), *provides at least two* definitions of "indecent language," either of which can be the basis for a conviction. In addition to the language underscored by the majority, 49 M.J. at 363–64, the Manual also provides that indecent language includes language that "is grossly offensive to modesty, de-

---

1. Perhaps the most famous judicial statement on this subject was made by Justice Stewart: "I shall not today attempt further to define the kinds of material I understand to be [obscene]; and perhaps I could never succeed in intelligibly

doing so. But I know it when I see it...." *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964)(Stewart, J., concurring).

cency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought." *Id.* Appellant's words fit this definition. His language was "grossly offensive" to "propriety" and was "vulgar, filthy, [and] disgusting."

*Id.* at 368.

Although the appellant dutifully admitted that the letter was obscene and sexually-oriented, these admissions were one-word answers to leading questions of the military judge. When given the opportunity to explain his intent, in his own words, the appellant clearly stated that he was simply angry and wanted the credit union to know that:

MJ: Now, I—these words that I'm going to use, Corporal Negron, are not intended to embarrass you. They are just—I have to make clear in my own mind that you are, in fact, guilty of this offense. Now, the words, "kiss my ass," might mean that you wanted someone at the Marine Corps Federal Credit Union to kiss your rear end. Is what you intended to convey to the reader?

ACC: **No, sir. I was just angry and I intended to offend them and get back at them for denying me.**

MJ: Okay. Did you intend to convey to them the message though that someone there at the Marine Corps Federal Credit Union could kiss your rear end?

ACC: Yes, sir.

MJ: Now, a "bastard" might define someone of illegitimate birth. Were you describing someone of illegitimate birth in your letter?

ACC: No, sir.

MJ: What did you mean by the word "bastard"? You might want to discuss that with Major Woodworth.

*The accused conferred with his defense counsel.*

ACC: **I wasn't paying so much attention to the technical definition of what it** **was, sir, I just threw the word out to offend them.**

Record at 35 (emphasis added). In choosing words like "kiss my ass," "blowjob," and "dick sucking," I believe that the record shows that the appellant did not actually intend to express sexual desire or moral dissolution. Rather, he was looking for the maximum possible shock value in his complaint letter.[2] While I am confident he achieved his objective, based on my review of the record, I cannot find that his language meets the test established by our superior Court. Thus, there is a substantial basis to question the appellant's guilty pleas to this offense. Being constrained by the precedents of *French* and *Brinson,* I have no choice but to vote to set aside the findings of guilty and dismiss the charge.

However, I believe that the *Brinson* dissent is persuasive. Accordingly, I urge our superior Court to reevaluate the restrictive "calculated to corrupt morals or excite libidinous thoughts" test. If the revolting language used by this Marine cannot be considered legally obscene and indecent, I would be hard pressed to imagine what language would pass an objective test.

### Appendix A

In defining "indecency," *Wharton's Criminal Law and Procedure,* which is the keystone in the evolution of what is now the applicable military-justice test for indecent language, indicates: "As ordinary understood, it includes anything which is lewd or lascivious, obscene or grossly vulgar, unbecoming, unseemly, unfit to be seen or heard, or which violates the proprieties of language or behavior." 2 WHARTON, CRIMINAL LAW AND PROCEDURE, sec. 782, page 623 (Anderson ed.1957). Additionally, *Wharton's* lists various other tests used to identify obscenity, including whether the questioned language *"shocks the ordinary and common sense* of men as an indecency...." *Id.* at sec. 780, page 618 (emphasis added). As it is with

---

2. The majority suggests that the appellant made a thoughtful and deliberate decision to use offensive language in the letter. I find nothing in the record to support this suggestion. I believe it is more likely, given the appellant's statements during the providence inquiry, that after he learned of the credit union's rejection of this loan application, he hurriedly and angrily dashed off a short note.

many cases, that simple, basic standard is one of the keys to this case, and it is a sonar by which courts should seek to ensure that they do not run aground amongst the rocks and shoals of unreasonable interpretations and applications. As in most things, there is a danger in the law straying too far from "the ordinary and common sense of men...." *Id.*

If the generally-agreed-to-be revolting language contained in Appellant's letter, to which an unknowing individual—perhaps more than one—was unknowingly subjected in the ordinary course of doing his or her job, cannot be the basis of some obscenity-related offense under the UCMJ, there would appear to be something amiss in the application of the law. This is particularly true, given the clear defining language in MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.), Part IV, ¶ 89c.

While the Court in *Brinson*, as discussed above, concludes the accused's verbal profanity spoken in the heat and "fog of war" was not indecent language, it was able to find that the evidence in the case was sufficient to establish the closely-related offense of disorderly conduct. In this case, however, due at least in part to its guilty-plea nature, we cannot so find. Sans any evidence of the circumstances of the actual receipt of Appellant's letter and the reaction of the reader or readers, this Court cannot conclude this "private" piece of correspondence constituted the offense of disorderly conduct. And, scanning the list of other possible UCMJ violations when—although not legally indecent—certain language presents a danger to good order and discipline, none are so triggered by the facts and circumstances of this case, with the exception a general Article 134, clause 2 violation, as discussed above.[1]

While we conclude that, based on the facts and circumstances of this case, the language Appellant used in his letter to the credit union is legally obscene under current controlling precedent, we make the point to lay the foundation for a request to our superior Court that—at its earliest appropriate opportunity—it reevaluate the restrictive "calculated to corrupt morals or excite libidinous thoughts" test, considering the persuasive appeal of then-Judge Crawford's dissent in *Brinson*, in which she was joined by Judge Gierke. *Brinson*, 49 M.J. at 368. As Chief Judge Crawford indicates in *Brinson*, Paragraph 89c, Part IV, MCM, *"provides at least two* definitions of 'indecent language,' either of which can be the basis for a conviction" for indecent language. *Id.*

Paragraph 89c defines "indecent language" as that "which is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, **or** its tendency to incite lustful thoughts." MCM, Part IV, ¶ 89c (emphasis added). That sentence should be read in the disjunctive, if for no other reason, because it is written in the disjunctive. The provision goes on, in separate sentences, to indicate: *"Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts.* The language must violate community standards." *Id.* (emphasis added).

A reasonable interpretation might well be that the penultimate sentence quoted and highlighted immediately above merely provides clarification of *one* aspect of what may be legally considered to be indecent language, and not that it is the limiting and exclusive definition of "indecent language" within the military justice system. This interpretation would breathe life back to the initial sentence of the MCM provision, which, it may be said, was placed there for a valid

---

1. *See United States v. Brinson*, 49 M.J. 360, 367–68 (C.A.A.F.1998)(Cox, C.J., concurring): "Article 88 proscribes contempt against certain officials of the Government; Article 89 prohibits disrespect towards superior officers; Article 91 prohibits contemptuous and disrespectful language towards warrant officers, noncommissioned officers, and petty officers while in the execution of office; Article 107 prohibits false official statements; Article 116 prohibits riots and breaches of the peace; and ... Article 117 prohibits provoking speeches or gestures." Additionally, language communicating a threat may be prosecuted under Article 134. *Id.; see also United States v. Sapp*, 53 M.J. 90 (C.A.A.F.2000), for a discussion of the general violation of Article 134, clause 2, UCMJ.

purpose and was put first because of its importance in providing—in the disjunctive—several inclusive, not exclusive, aspects of what may be considered as indecent language.

When combined with an application of "the precise circumstances under which the charged language was communicated" requirement of the *French/Brinson* indecent-language test, this interpretation of the message and intent of Paragraph 89c would provide the free-speech protections (then) Chief Judge Cox sought to ensure by his concurring opinion in *Brinson,* which he indicates was written specifically "to answer some of the questions raised by [then] Judge Crawford" in her dissent. *Brinson,* 49 M.J. at 365. (Then) Chief Judge Cox discusses *Linyear* basically for the proposition that "insulting" language will not be considered an indecent communication when it " '*cannot reasonably be construed to convey a libidinous message.*' " *Brinson,* 49 M.J. at 367 (Cox, C.J. concurring)(quoting *United States v. Linyear,* 3 M.J. 1027, 1030 (N.C.M.R.)). In *Linyear,* the issue was whether the calling a female servicemember a "swine" was indecent language within the situational context. *Linyear,* 3 M.J. at 1030.[2] Thus, not fitting in the initial aspects of the Paragraph 89c definition of indecent language, the only possible way the use of the word "swine" said in "a belligerent 'smart-alecky' tone of voice" appropriately could be adjudged to be indecent is if it fit the "libidinous message" part of the Paragraph 89c definition of indecent language. Thus, the approach and result in *Linyear* is not inconsistent or problematic with the revisions to the indecent-language test suggested by Chief Judge Crawford in her *Brinson* dissent.

Likewise, in *United States v. Simmons,* 27 C.M.R. 654 (A.B.R.1959), the case from which the Court in *Linyear* took the "libidinous message" standard,[3] the issue was whether sentences that are "innocuous" standing alone could be considered offensive "if spoken in a context or in a connection that would infuse them with an objectionable significance." *Simmons,* 27 C.M.R. at 656. Once again, the only possible aspect of Paragraph 89c that could apply to such a circumstances is the "libidinous message" provision.

Such is also the case with the circumstances in *United States v. Wainwright,* 42 C.M.R. 997, 1970 WL 7286 (A.F.C.M.R.1970), which also cited by (then) Chief Judge Cox in his concurring opinion in *Brinson.* In *Wainwright,* the words used by the accused did not on their face "convey an indecent message," and the Court ruled: "We are not prepared to conclude, however, that expressions *otherwise barren of libidinous innuendo, when given their ordinary meaning,* can be infused with criminality by the simple expedient of alleging them to be indecent." *Id.* at 1000. In our case herein, Appellant's words and graphic expressions are not "barren of libidinous innuendo" and nothing need be added to their "ordinary meaning" to make them indecent.

Another concern expressed by (then) Chief Cox in his *Brinson* concurring opinion is that if the definition of indecent language provided in Paragraph 89c is applied in its entirety "scarcely a day would pass without numerous violations of the Uniform Code if servicemembers were prosecuted for using the well-known 'four letters words.' Sadly, the lexicon of many servicemembers is replete with such profanity." *Brinson,* 49 M.J. at 367 (Cox, C.J., concurring).

While it is unnecessary in this context to examine the issue fully, one wonders whether the Naval Service's renewed commitment to its traditional core values, as applied to today's cultural environment in the Navy and Marines Corps, has changed or challenged the "acceptability" of traditional "sailor talk" commonly spiced with profanity, and thus altering, perhaps, the "community standard," as it applies to the issue of indecent language. Any concern, however, that mere "coarse language" among "consenting" servicemembers will be prosecuted *per se* as

---

2. "A word is not a crystal, transparent and unchanged, it is skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it

used." *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918).

3. *See Linyear,* 3 M.J. at 1030.

indecent language appears unfounded, given the circumstances-of-the-communication aspect of the military-justice test for obscenity, even if the Paragraph 89c definition of indecent language is fully applied. *See United States v. Prince,* 14 M.J. 654, 656 (A.C.M.R. 1982).

Thus, it is respectfully submitted—modified by a consideration of the circumstances of the communication within any given case—that a full application of the Paragraph 89c definition of indecent language may be made, while taking into account and protecting against the manifestations of the concerns expressed by Judge Cox and others as discussed above.